CASE NO. 12-11507-EE

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

ROBERT ADAMS, ET AL.,
Plaintiffs-Appellants,

v.

AUSTAL USA, LLC,
Defendant-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

District Court Docket No.  1:08-cv-00155-KD-N

_____

**PRINCIPAL BRIEF OF DEFENDANT-APPELLEE
AUSTAL USA, LLC**

_____

Brian McCarthy, Esq.
Thomas M. O'Hara, Esq.
Anne Laurie McClurkin, Esq.
**McDOWELL KNIGHT ROEDDER
  & SLEDGE, L.L.C.**
Post Office Box 350
Mobile, Alabama 36601
Telephone:  251-432-5300
Facsimile:  251-432-5303
www.mcdowellknight.com
*Counsel for Defendant-Appellee
 Austal USA, LLC*

*Robert Adams, et al. v. Austal USA, LLC*                    Case No. 12-11507-EE

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee, Austal USA, LLC, pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, provides its nongovernmental corporate party disclosure by stating that it is a direct, wholly-owned subsidiary of Austal Holdings, Inc., which is a wholly-owned subsidiary of Austal Limited, which is an Australian publicly-held corporation traded under the Australian Securities Exchange symbol ASB, and the undersigned counsel hereby certifies that the following is a complete list of persons and entities having an interest in the outcome of this appeal:

Adams, Earaton

Adams, Robert, Appellant

Austal Holdings, Inc.

Austal Limited (ASB)

Austal USA, LLC, Appellee

Barnes, Myron

Bell, John W., counsel for Appellee

Barnes & Thornburg LLP, former counsel for Appellee

Brewster, Henry, counsel for Appellants

Bumpers, Nelson, Appellant

*Robert Adams, et al. v. Austal USA, LLC*                    Case No. 12-11507-EE

Calamusa, Rocco Jr., counsel for Appellants

Carter, Frederick A. Sr., Appellant

Cunningham, Alvin, Appellant

DuBose, Kristi K., Judge, United States District Court for the Southern District of Alabama

Georgiannis, Alexander Nicholas, former counsel for Appellants

Hedgeman, Sidney, Appellant

Hollis, Tesha, Appellant

Jent, Kevin W., counsel for Appellants

Johnson, Carlos

Kiser, Jacob Andrew, counsel for Appellants

Laffiette, Larry J., Appellant

Law, Ron, Appellant

Matthews, Jermel

McCarthy, Brian P., counsel for Appellee

McClurkin, Anne Laurie, counsel for Appellee

McDowell, Knight, Roedder & Sledge, L.L.C., counsel for Appellee

McGowan, Candis A., counsel for Appellants

Murphy, Hannesson I., former counsel for Appellee

*Robert Adams, et al. v. Austal USA, LLC*                    Case No. 12-11507-EE

O'Hara, Thomas M., counsel for Appellee

Pettibone, Jerome, Appellant

Prather, R. Anthony, former counsel for Appellee

Pratt, Rahman K., Appellant

Quinn, C. Michael, counsel for Appellants

Reed, Nathaniel L., Appellant

Reeves, Archibald T. IV, counsel for Appellee

Roberson, Jermaine

Robertson, Ann C., counsel for Appellants

Slay, Carolyn, Appellant

Sledge, Edward S. III, Counsel for Appellee

Stills, Charles L. III

Sullivan, Gloria, Appellant

Thomas, Beverly

Thomas, Franklin, Appellant

Wells, George

Wiggin, Childs, Quinn, & Pantazis, P.C., counsel for Appellants

Williams, Frederick, Appellant

*/s/ Anne Laurie McClurkin*
Anne Laurie McClurkin

C-3 of 3

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellee, Austal USA, LLC ("Austal"), does not believe oral argument is necessary inasmuch as the issues Robert Adams, Nelson Bumpers, Alvin Cunningham, Tesha Hollis, Larry Laffiette, Ron Law, Jerome Pettibone, Rahman Pratt, Nathaniel Reed, Carolyn Slay, Gloria Sullivan, Franklin Thomas, and Frederick Williams (the "Non-Trial Plaintiffs") and Frederick Carter and Sidney Hedgeman (collectively "Appellants") raise in their appeal have been authoritatively decided in the Eleventh Circuit. Should the Court deem it useful, however, Austal welcomes the opportunity to orally argue its case before the Court.

## <u>CITATIONS TO THE RECORD</u>

Austal cites the record and trial transcript as follows:  "R[district court document number]:[court page number(s)]" and "Tr[trial transcript page number]". Additionally, citations to footnotes in a court document will be cited as "R[district court document number]:n.[footnote]".

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

CITATIONS TO THE RECORD .................................................................. ii

TABLE OF CONTENTS........................................................................... iii

TABLE OF CITATIONS .......................................................................... vi

TABLE OF RECORD REFERENCES ......................................................... xiv

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE.......................................................................1

  I.   Course of Proceedings and Disposition in the Court Below ...........................1

  II.  Statement of Facts...........................................................................4

    A.  Non-Trial Plaintiffs .......................................................................7

    B.  Trial Testimony .........................................................................31

  III.  Standard of Review........................................................................46

    A.  *Batson* Challenges .....................................................................46

    B.  *Faragher* Defense And Rebuttal Witnesses.............................................46

    C.  Jury Instructions ........................................................................47

SUMMARY OF THE ARGUMENT ...............................................................47

ARGUMENT AND CITATIONS TO AUTHORITY ...........................................49

I.   The District Court Properly Declined To Aggregate All 23 Plaintiffs'
     Individual Allegations Of Harassment In Deciding Whether Each Of The
     Non-Trial Plaintiffs Reasonably Perceived The Alleged Harassment To Be
     Severe Or Pervasive......................................................................................50

II.  The District Court Applied The Correct "Reasonable Person In Plaintiff's
     Position" Standard .........................................................................................52

III. The District Court Properly Considered The Totality Of The Circumstances
     For Each Non-Trial Plaintiff On An Individual Basis. .................................54

   A. Appellants Distort The Meaning Of The "Totality Of The Circumstances"
      Test Beyond All Reasonable Recognition. ................................................54

   B. Appellants Have Not Established That "Me Too" Evidence Is Admissible
      To Establish The Non-Trial Plaintiffs Experienced Reasonably Severe Or
      Pervasive Harassment. ...............................................................................56

IV.  The District Court Correctly Held That The Non-Trial Plaintiffs Failed To
     Establish That The Alleged Harassment Was Severe Or Pervasive. ...........64

   A. The Non-Trial Plaintiffs Failed to Establish Severe or Pervasive
      Harassment...................................................................................................64

   B. The Non-Trial Plaintiffs' Allegations Are Distinguishable From *Mack*. ...74

V.   The District Court Did Not Consider Austal's *Faragher* Evidence Or
     Punitive Damages Defense In Deciding That The Non-Trial Plaintiffs Failed
     to Establish Severe Or Pervasive Harassment.............................................75

VI.  The District Court Did Not Err In Its Evidentiary Rulings Concerning "Me
     Too" Evidence At Trial. ...............................................................................77

   A. The District Court Properly Limited The Amount Of "Me Too" Evidence
      Carter and Hedgeman Could Present In Their Case-In-Chief...................77

   B. Carter And Hedgeman Did Not Offer "Me too" Evidence To Rebut
      Austal's Defenses And They Have Waived This Issue On Appeal............82

iv

VII. Appellants Have Not Demonstrated Any of the District Court's Evidentiary Rulings Resulted In Reversible Error............................................................ 83

VIII. The District Court Did Not Abuse Its Discretion In Allowing Austal To Proceed With Its *Faragher* Defense............................................................84

IX.  The District Court Properly Denied Carter's and Hedgeman's *Batson* Challenges.................................................................................................86

X.   The District Court Properly Instructed The Jury..........................................87

XI.  The District Court Did Not Abuse Its Discretion In Allowing Austal's Rebuttal Witnesses To Testify At Trial.......................................................89

XII. Appellants Have Not Attempted To Establish The Jury's Verdict Was Clearly Erroneous Or That The District Court Erred In Denying Their Motion For Judgment As A Matter of Law And They Have Waived These Issues............................................................................................................91

CONCLUSION ....................................................................................................92

CERTIFICATE OF COMPLIANCE....................................................................92

CERTIFICATE OF SERVICE .............................................................................93

## TABLE OF CITATIONS

### CASES

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242 (1986)……………………………………………..77

*Baldwin v. Blue Cross/Blue Shield of Ala.*,

    480 F.3d 1287 (11th Cir. 2007)…………………………………76

*Barrow v. Ga. Pacific Corp.*,

    144 Fed. Appx. 54 (11th Cir. 2005) ..................................66, 67, 73

*Batson v. Kentucky*,

    476 U.S. 79 (1986).........................................................................86

*Brooks v. City of San Mateo*,

    229 F.3d 917 (9th Cir. 2000) ..................................................51, 88

*Busby v. City of Orlando*,

    931 F.2d 764 (11th Cir. 1991) ................................................57, 60

*Calamia v. Spivey*,

    632 F.2d 1235 (5th Cir. 1980) ............................................... 89-90

*Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*,

    332 Fed. Appx. 565 (11th Cir. 2009) .....................................47, 88

*Dees v. Johnson Controls World Services, Inc.*,

    168 F.3d 417 (11th Cir. 1999) ....................................................65

*Delph v. Dr. Pepper Bottling Co., of Paragould, Inc.*,

    130 F.3d 349 (8th Cir. 1997) ........................................................63

*Eades v. Ala. Dep't of Human Res.*,

    298 Fed. Appx. 862 (11th Cir. 2008) .....................................46, 89

*Edwards v. Wallace Cmty. College*,

    49 F.3d 1517 (11th Cir. 1995) .................................................50, 88

*Ellis v. England*,

    432 F.3d 1321 (11th Cir. 2005) ...................................................73

*Faragher v. City of Boca Raton*,

    524 U.S. 775 (1998).....................................................................64

*Goldsmith v. Bagby Elevator Co.*,

    513 F.3d 1261 (11th Cir. 2008) ...................................... 57, 58, 59, 62, 83, 90

*Grant v. Preferred Research, Inc.*,

    885 F.2d 795 (11th Cir. 1989) .....................................................85

*Guthrie v. Waffle House, Inc.*,

    460 Fed. Appx. 803 (11th Cir. 2012) ..........................................65

*Harris v. Forklift Sys.*,

    510 U.S. 17 (1993).................................................51, 53, 64, 73

*Hassan v. U.S. Postal Serv.*, 842 f.2D 260 (11th Cir. 1988)……………………85

*Hayes v. Sebelius*,

    806 F. Supp. 2d 141 (D.D.C. 2011)..............................................................81

*Hicks v. Gates Rubber Co.*,

    833 F.3d 1406 (10th Cir. 1987) ...........................................................61, 63

*Howard v. Burns*,

    149 F.3d 835 (8th Cir. 1998) .......................................................................63

*Howard v. City of Robertsdale*,

    168 Fed. Appx. 883 (11th Cir. 2006) ....................................................76, 84

*Hurley v. Atl. City Police Dept.*,

    174 F.3d 95 (3d Cir. 1999) ..........................................................................63

*Jackson v. Quanex Corp.*,

    191 F.3d 647 (6th Cir. 1999) .......................................................................63

*Jennings v. Univ. of N. Carolina*,

    482 F.3d 686 (4th Cir 2007) .......................................................................61

*Johnson v. Ala. Cmty. College Sys.*,

    2011 WL 5078771 (M.D. Ala. Oct. 25, 2011) ……………………………81

*Johnson v. Booker T. Washington Broadcasting Service, Inc.*,

    234 F.3d 501 (11th Cir. 2000) ...............................................................65, 81

*Jones v. UPS Ground Freight*,

    683 F.3d 1283 (11th Cir. 2012) ..................................................................71

*King v. McMillan*,

    2008 WL 957877 (W.D. Va. Apr. 8, 2008)...................................................62

*Lanier Const., Inc. v. Carbone Prop. of Mobile, LLC*,

    253 Fed. Appx. 861 (11th Cir. 2007)………………………………..83

*Lehman v. Toys R. Us, Inc.*,

    626 A.2d 445 (N.J. 1993) ..............................................................................63

*Lewis v. Dept. of Transp.*,

    187 Fed. Appx. 961 (11th Cir. 2006) ...........................................................61

*Mack v. St. Mobile Aerospace Eng'g., Inc.*,

    195 Fed. Appx. 829 (11th Cir. 2006) .........................................56-58, 74-75

*Madison v. IBP, Inc.*,

    257 F.3d 780 (8th Cir. 2001) ........................................................................63

*McCann v. Tillman*,

    526 F.2d 1370 (11th Cir. 2008) ..............................................................66, 73

*McCormick v. Aderholt*,

    293 F.3d 1254 (11th Cir. 2002) ........................................................ 47, 87-88

*Melton v. National Dairy, LLC*,

    705 F. Supp. 2d 1303 (M.D. Ala. 2010)........................................................51

ix

*Mendoza v. Borden, Inc.*,

    195 F.3d 1238 (11th Cir. 1999) ...................................................51, 52, 53, 66

*Mesa Air Group., Inc. v. Delta Air Lines, Inc.*,

    573 F.3d 1124 (11th Cir. 2009) ....................................................................91

*Miller v. Kenworth of Dothan, Inc.*,

    277 F.3d 1269 (11th Cir. 2002) ..............................................................49, 65

*Mitchell v. Carrier Corp.*,

    954 F. Supp. 1568 (M.D. Ga. 1995) ...........................................69, 70, 73, 75

*Mosaic Fertilizer, LLC v. Van Fleet Int'l Airport Dev. Group, LLC*,

    2012 WL 3490904 (11th Cir. Aug. 15, 2012) .............................................87

*Oncale v. Sundowner Offshore Servs., Inc.*,

    532 U.S. 75 (1998)........................................................................................53

*Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*,

    684 F.3d 1211 (11th Cir. 2012) ....................................................................87

*Perry v. State Farm Fire & Cas. Co.*,

    734 F.2d 1441 (11th Cir. 1984) ....................................................................83

*Phillip v. ANR Freight Sys., Inc.*,

    945 F.2d 1054 (8th Cir. 1991) ......................................................................63

*Proctor v. Fluor Enter., Inc.*

    494 F.3d 1337 (11th Cir. 2007) ....................................................................46

*Reeves v. C.H. Robinson World Wide, Inc.*,

    594 F.3d 798 (11th Cir. 2010) ........................................................64

*Reeves v. DSI Sec. Servs., Inc.*,

    395 Fed. Appx. 544 (11th Cir. 2010) ............................................54

*Roberts & Schaefer Co. v. Hardaway Co.*,

    152 F.3d 1283 (11th Cir. 1998) ....................................................87

*Rogers v. EEOC*,

    454 F.2d 234 (5th Cir. 1971) ...................................................62, 63

*Saunders v. Wal-Mart Stores, Inc.*,

    300 Fed. Appx. 697 (11th Cir. 2008) ............................................46

*Schwapp v. Town of Avon*,

    188 F.3d 106 (2d Cir. 1997) .........................................................53

*SmithKline Beecham Corp. v. Apotex Corp.*,

    439 F.3d 1312 (11th Cir. 2006) ....................................................92

*Sprint/United Mgmt. Co. v. Mendelsohn*,

    552 U.S. 379 (2008)................................................................. 80-81

*U.S. v. Stearns*,

    385 Fed. Appx. 885 (11th Cir. 2010) ............................................47

*U.S. v. Tinoco*,

    304 F.3d 1088 (11th Cir. 2002) ....................................................80

*Walker v. Ford Motor Co.*,

    684 F.2d 1355 (11th Cir. 1982) ....................................................................60

*Washington v. Kroger Co.*,

    218 Fed. Appx. 822 (11th Cir. 2007) ...........................................................66

*Webb v. Worldwide Flight Serv. Inc.*,

    407 F.3d 1192 (11th Cir. 2005) ....................................................................65

*Whitby v. Sec'y for the Dep't of Homeland Sec.*,

    No. 11-10861, 2012 WL 2504919 (11th Cir. June 28, 2012) .................49, 88

*Williams v. Conagra Poultry Co.,*

    378 F.3d 790 (8th Cir. 2004) ........................................................................63

*Wyninger v. New Venture Gear, Inc.*,

    361 F.3d 965 (7th Cir. 2004) ........................................................................81

*Ziskie v. Mineta*,

    547 F.3d 220 (4th Cir. 2008) ........................................................................61

## STATUTES

42 U.S.C. § 1981 ......................................................................................................1

42 U.S.C. § 2000e ....................................................................................................2

## OTHER AUTHORITIES

Eleventh Circuit Pattern Jury Instructions…………………………………………...88

11th Cir. R. 10-1 ...........................................................................................86

Fed. R. App. P. 10........................................................................................86, 87

Fed. R. Civ. P. 8...........................................................................................85

Fed. R. Evid. 403 .........................................................................................80

## TABLE OF RECORD REFERENCES

| Brief Page # | Document | Docket # |
|:---:|:---|:---:|
| 1 | Third Amended Complaint | 37 |
| 2, 84 | Answer to Third Amended Complaint | 38 |
| 29-30, 55 | Evidence Supporting  Summary Judgment (R. Adams) | 161-1 |
| 31 | Evidence Supporting Summary Judgment (R. Adams Rate Increase Form) | 161-3 |
| 31 | Evidence Supporting Summary Judgment (R. Adams Change of  Status Form) | 161-4 |
| 31 | Evidence Supporting Summary Judgment (R. Adams Evaluations) | 161-16 |
| 24-25, 55 | Evidence Supporting Summary Judgment (Bumpers) | 167-1 |
| 9, 12-13, 68-69, 72 | Evidence Supporting Summary Judgment (Hollis) | 170-1 |
| 13-14 | Evidence Supporting Summary Judgment (Cunningham) | 174-1 |
| 85 | Brief Supporting Summary Judgment (Carter) | 201 |
| 7-10, 69, 72, 74 | Evidence Supporting Summary Judgment (Pettibone) | 202-1 |
| 7, 68 | Evidence Supporting Summary Judgment (Pettibone) | 202-2 |
| 8, 11, 13, 17, 19-21, 23, 25, 27, 30, 69 | Evidence Supporting Summary Judgment (Pettibone) | 202-3 |
| 17-19, 69, 72 | Evidence Supporting Summary Judgment (Law) | 204-1 |
| 19 | Evidence Supporting Summary Judgment (Law) | 204-2 |
| 19 | Evidence Supporting Summary Judgment (Law) | 204-3 |
| 25-27 | Evidence Supporting Summary Judgment (Pratt) | 205-1 |
| 27 | Evidence Supporting Summary Judgment (Matthews) | 206-1 |

| | | |
|---|---|---|
| 10-11 | Evidence Supporting Summary Judgment (Laffiette) | 209-1 |
| 9, 11, 14 | Evidence Supporting Summary Judgment (Laffiette) | 209-3 |
| 27-29, 33 | Evidence Supporting Summary Judgment (F. Thomas) | 212-1 |
| 16-17 | Evidence Supporting Summary Judgment (Reed) | 213-1 |
| 21-24 | Evidence Supporting Summary Judgment (Sullivan) | 214-1 |
| 91 | Evidence Supporting Summary Judgment (Sullivan Responses to Interrogatories) | 214-3 |
| 9, 14 | Evidence Supporting Summary Judgment (Sullivan) | 214-4 |
| 15-16 | Evidence Supporting Summary Judgment (Williams) | 215-1 |
| 8-9, 11, 14-15 | Evidence Supporting Summary Judgment (Williams) | 215-4 |
| 21 | Evidence Supporting Summary Judgment (Slay) | 218-1 |
| 24 | Evidence Supporting Summary Judgment (Sullivan Change of Status Forms) | 222-1 |
| 85 | Brief Supporting Summary Judgment (Hedgeman) | 279 |
| 8-9, 11, 71 | Evidence Opposing Summary Judgment (Friedlieb Deposition Excerpts) | 284-8 |
| 6, 14 | Evidence Opposing Summary Judgment (Cunningham Deposition Excerpts) | 285-10 |
| 12 | Evidence Opposing Summary Judgment (Hollis Deposition Excerpts) | 285-11 |
| 11 | Evidence Opposing Summary Judgment (Laffiette Deposition Excerpts) | 285-13 |
| 18-19, 74 | Evidence Opposing Summary Judgment (Law Deposition Excerpts) | 285-14 |
| 68 | Evidence Opposing Summary Judgment (Pettibone Deposition Excerpts) | 285-16 |
| 6, 26-27 | Evidence Opposing Summary Judgment (Pratt Deposition Excerpts) | 285-17 |
| 16 | Evidence Opposing Summary Judgment (Reed | 285-19 |

| | | |
|---|---|---|
| | Declaration) | |
| 20-21, 71 | Evidence Opposing Summary Judgment (Slay Deposition Excerpts) | 285-21 |
| 22-23 | Evidence Opposing Summary Judgment (Sullivan Declaration) | 285-24 |
| 28 | Evidence Opposing Summary Judgment (F. Thomas Deposition Excerpts) | 285-26 |
| 91 | Evidence Opposing Summary Judgment (F. Thomas Responses to Interrogatories) | 286-34 |
| 1 | Order Allowing Appellants 15 Additional Pages to Respond to Summary Judgment | 293 |
| 5, 7, 10, 12-13, 15, 19, 21, 24-26, 29-31 | Employment Data | 295 (Sealed) |
| 85 | Response in Opposition to Summary Judgment (Carter) | 312 |
| 85 | Response in Opposition to Summary Judgment (Hedgeman) | 321 |
| 15 | Evidence Supporting Summary Judgment (Williams Deposition Excerpts) | 328-2 |
| 13 | Evidence Supporting Summary Judgment (Hollis Deposition Excerpts) | 329-2 |
| 11 | Evidence Supporting Summary Judgment (Laffiette Deposition Excerpts) | 331-2 |
| 9, 14 | Evidence Supporting Summary Judgment (Slay EEOC Charge) | 333-1 |
| 11, 19-20, 72 | Evidence Supporting Summary Judgment (Slay Deposition Excerpts) | 333-2 |
| 9, 14, 16-17 | Evidence Supporting Summary Judgment (Reed EEOC Charge) | 336-1 |
| 16-17 | Evidence Supporting Summary Judgment (Reed Deposition Excerpts) | 336-2 |
| 27 | Evidence Supporting Summary Judgment (Pratt Deposition Testimony) | 337-2 |
| 9, 14 | Evidence Supporting Summary Judgment (F. Thomas EEOC Charge) | 338-1 |
| 8, 19-20, 23 | Evidence Supporting Summary Judgment (O'Dell Deposition Excerpts) | 339-4 |

| | | |
|---|---|---|
| 9, 14 | Evidence Supporting Summary Judgment (Pettibone EEOC Charge) | 342-1 |
| 8 | Evidence Supporting Summary Judgment (Pettibone Deposition Excerpts) | 342-2 |
| 8-9, 11, 71 | Evidence Supporting Summary Judgment (Friedlieb Deposition Excerpts) | 342-4 |
| 9, 14, 19 | Evidence Supporting Summary Judgment (Law EEOC Charge) | 343-1 |
| 19 | Evidence Supporting Summary Judgment (Law Deposition Excerpts) | 343-2 |
| 14 | Evidence Supporting Summary Judgment (Cunningham EEOC Charge) | 349-1 |
| 14 | Evidence Supporting Summary Judgment (Cunningham Deposition Excerpts) | 349-2 |
| 24-25 | Evidence Supporting Summary Judgment (Bumpers Deposition Excerpts) | 350-2 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against E. Adams | 364 |
| 2, 4, 50 | Order Granting Summary Judgment Against R. Adams | 369 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against Barnes | 370 |
| 2, 4, 5 | Order Granting In Part / Denying In Part Summary Judgment Against Hedgeman | 373 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against Wells | 374 |
| 2, 4, 50 | Order Granting In Part / Denying In Part Summary Judgment Against Bumpers | 375 |
| 2, 4, 50 | Order Granting Summary Judgment Against F. Thomas | 376 |
| 2, 4, 50, 52-55, 58-60, 63, 67, 69 | Order Granting Summary Judgment Against Pettibone | 378 |
| 2, 4, 50 | Order Granting Summary Judgment Against Law | 379 |
| 2, 4, 50 | Order Granting Summary Judgment Against Pratt | 397 |
| 2, 4 | Order Granting In Part / Denying In Part Summary Judgment Against Carter | 398 |

| | | |
|---|---|---|
| 90 | Order Granting In Part / Denying In Part Motion to Sever | 399 |
| 90 | Standing Order Governing Final Pretrial Conference | 399-1 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against Johnson | 401 |
| 90 | Austal's Trial Witness List | 409-10 |
| 2-3, 90 | Pretrial Order setting, inter alia, Jury Selection | 414 |
| 2, 4, 22, 50 | Order Granting Summary Judgment Against Sullivan | 420 |
| 78 | Austal's Motion in Limine to Preclude Non-Trial Plaintiff Testimony | 432 |
| 2, 4, 50 | Order Granting Summary Judgment Against Williams | 435 |
| 2, 4, 50 | Order Granting In Part / Denying In Part Summary Judgment Against Cunningham | 436 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against Stills | 437 |
| 90 | Austal's Amended Trial Witness List | 453-3 |
| 88 | Plaintiffs' Proposed Jury Instructions | 463 |
| 2, 4, 50 | Order Granting Summary Judgment Against Slay | 480 |
| 78, 82 | Order Denying Austal's Motion in Limine to Preclude Non-Trial Plaintiff Testimony | 481 |
| 2, 4, 50 | Order Granting Summary Judgment Against Hollis | 488 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against Matthews | 489 |
| 2, 4, 50 | Order Granting In Part / Denying In Part Summary Judgment Against Reed | 493 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against Roberson | 494 |
| 79, 82 | Order Denying Appellants' Motion to Alter | 496 |
| 2, 4, 50 | Order Granting Summary Judgment Against Laffiette | 513 |

| | | |
|---|---|---|
| 3, 50 | Jury Verdicts (Trial 1) | 515 |
| 2 | Order Granting In Part / Denying In Part Summary Judgment Against B. Thomas | 536 |
| 3 | Motion for JMOL/New Trial (Carter) | 540 |
| 3 | Motion for JMOL/New Trial (Hedgeman) | 541 |
| 3 | Order Denying Motion for JMOL/New Trial (Carter) | 554 |
| 3 | Order Denying Motion for JMOL/New Trial (Hedgeman) | 555 |
| 2-3 | Pretrial Order setting Jury Selection (Trial 3) | 568 |
| 2-3 | Pretrial Order setting Jury Selection (Trial 2) | 569 |
| 3, 50 | Jury Verdict (Trial 2) | 718 |
| 3, 50 | Jury Verdicts (Trial 3) | 719 |
| 3 | Motion for New Trial (Trial 2) | 750 |
| 3 | Motion for JMOL/New Trial (Trial 3) | 751 |
| 3, 91 | Notice of Appeal (Carter & Hedgeman) | 752 |
| 3 | Notice of Appeal (R. Adams, Bumpers, Cunningham, Hollis, Laffiette, Law, Pettibone, Pratt, Reed, Slay, Sullivan, F. Thomas, and Williams) | 753 |
| 3 | Order Denying Motion for New Trial (R750) and Motion for JMOL/New Trial (R751) | 757 |
| 3 | Notice of Appeal (E. Adams, Barnes, Johnson, Matthews, Roberson, Stills, and Wells) | 771 |
| 3 | Notice of Appeal (B. Thomas) | 772 |
| 35-38, 88 | Official Trial Transcript for 9/26/2011 (Tr1-Tr305) | 789 |
| 40, 79 | Official Trial Transcript for 9/27/2011 (Tr306-Tr606) | 790 |
| 32-35, 40-41, 79 | Official Trial Transcript for 9/28/2011 (Tr607-Tr934) | 791 |
| 5, 31-35, 40-41, 79 | Official Trial Transcript for 9/29/2011 (Tr935-Tr1225) | 792 |
| 41-43, 82 | Official Trial Transcript for 9/30/2011 | 793 |

| | (Tr1226-Tr1472) | |
|---|---|---|
| 32, 35-40, 43-46, 82 | Official Trial Transcript for 10/3/2011 (Tr1473-Tr1766) | 794 |
| 88 | Official Trial Transcript for 10/4/2011 (Tr1767-1876) | 795 |
| 86 | Jury Selection Transcript Request Form | 797 |
| 36 | Acknowledgement Form | D Trial Ex. 15-A |
| 36, 43 | Letter from Browning to Councilman Richardson | Ps Trial Ex. 35 |
| 34 | Memorandum to Warehouse employees | Ps Trial Ex. 61 |
| 35 | 2004 Orientation Booklet Excerpt | Ps Trial Ex. 64 |
| 35 | 2005 Orientation Booklet Excerpt | Ps Trial Ex. 65 |
| 35 | 2006 Orientation Booklet Excerpt | Ps Trial Ex. 68 |
| 35 | 2007 Orientation Booklet Excerpt | Ps Trial Ex. 70 |

## STATEMENT OF THE ISSUES

1.    Whether the district court properly granted summary judgment in Austal's favor on the hostile environment claims asserted by the Non-Trial Plaintiffs?

2.    Whether the district court abused its discretion in (i) limiting the "me too" evidence Hedgeman and Carter presented at trial during their in their case-in-chief; (ii) holding Austal timely asserted its *Faragher* defense; and (iii) permitting Austal's previously disclosed rebuttal witnesses to testify?

3.    Whether the district court's jury instructions, taken from the Eleventh Circuit Pattern Jury Instructions, misstated the law and misguided the jury?

## STATEMENT OF THE CASE

This appeal involves 13 district court orders on summary judgment and two jury verdicts dismissing in total 15 hostile environment claims.

## I.    Course of Proceedings and Disposition in the Court Below

This action was filed as a purported class action by 23 current and former employees (collectively "Plaintiffs") alleging race discrimination.  (R37).   The class was not certified, and Plaintiffs' claims proceeded individually.  (R293:n.6). Plaintiffs asserted claims for hostile environment, disparate treatment (pay and promotion), disparate impact, and/or retaliation under 42 U.S.C. § 1981 and Title

1

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"). Austal answered the complaint denying all claims. (R38). Austal asserted several defenses, including Plaintiffs' failure to "mitigate their damages." (R38:250).

Austal moved the district court for summary judgment on each claim. (Appellants' Br., p.32). Appellants argued that their allegations of harassment should be "viewed through the lens of the plaintiffs' collective allegations . . . ." (*E.g.*, R369:n.5). The district court disagreed and analyzed the harassment allegations for each Appellant individually based on the alleged incidents the Appellant was aware of and summarily dismissed the Non-Trial Plaintiffs' harassment claims. (R369;R375-R376;R378-R379;R397;R420;R435-R436;R480;R488;R493;R513). The district court did not consider certain harassment allegations because they lacked racial connotations or were implausible. (R420:13,n.9;R480:n.11,n.12).

The district court denied summary judgment with regard to, inter alia, the hostile environment claims asserted by Earaton Adams, Myron Barnes, Frederick Carter, Sidney Hedgeman, Carlos Johnson, Jermel Matthews, Jermaine Roberson, Charles Stills, Beverly Thomas, and George Wells. (R364;R370;R373-R374;R398;R401;R437;R489;R494;R536).

The district court scheduled three trials on the hostile environment claims that survived summary judgment. (R414;R568-R569). Ultimately, three different

2

juries rejected the claims.  The first trial included the claims of E. Adams, Barnes, Carter, Hedgeman, and Johnson; the jury returned a verdict for Austal on every claim except E. Adams's, Barnes's, and Johnson's harassment claims on which it was undecided.  (R414;R515).  The second trial consisted of only B. Thomas's claims; the jury returned a verdict for Austal on all claims.  (R569;R718).  The third trial consisted of the hostile environment claims of E. Adams, Barnes, Johnson, Matthews, Roberson, Stills, and Wells; the jury returned a verdict for Austal on all claims.  (R568;R719).

E. Adams, Barnes, Carter, Hedgeman, Johnson, Matthews, Roberson, Stills, B. Thomas, and Wells moved the district court for judgments as a matter of law and/or new trials.  (R540-R541;R750;R751).  The district court denied each motion.  (R554-R555;R757).

Each Plaintiff appealed.  (R752-R753;R771-R772).  The Non-Trial Plaintiffs appeal the district court's orders summarily dismissing their hostile environment claims.  (Appellants' Br., pp.89-90).  Carter and Hedgeman appeal the district court's jury instructions and evidentiary rulings.[1]  (Appellants' Br., p.90).  The

---

[1]    In their brief, Appellants do not argue that the jury's verdict was clearly erroneous or that the district court erred in denying their motion for judgment as a matter of law.  (*Compare* R752:2 *with* Appellants' Br., pp.89-118).  Accordingly, they waived such argument.  (*See*, *infra*, at p.91-92).

3

remaining Plaintiffs' appeals are currently pending before the Court as Appeal No. 12-12182.

For the reasons demonstrated herein, the district court's orders and the jury's verdicts are due to be affirmed.

## II.    Statement of Facts

As a preliminary matter, Appellants' factual statement misstates certain facts and includes others that are wholly irrelevant to these appeals either because the district court did not consider the evidence on summary judgment or in the case of Carter and Hedgeman, the evidence was not presented to the jury.  During the period 2004 to present, Austal employed from approximately 150 to 2,200 employees to manufacture customized aluminum commercial and military vessels. Plaintiffs, as a group, did not work at Austal during the same time periods, did not work for the same supervisors, and did not work in the same department or even in the same buildings.       (R369:2-3;R373:2-4;R375:2-3;R376:2-3;R378:2-3;R379:2;R397:2;R398:2-3;R420:2-3;R435:2-3;R436:2;R480:2-3;R488:2-3;R493:2-3;R513:2).  Appellants' repeated attempts to persuade the district court and now this Court to review their claims "through the lens of the plaintiffs' collective allegations" ignores the reality that each Plaintiff's work environment was markedly different.  (*E.g.,* R369:n.5).  For example, Bumpers worked in the Fabrication Department from November 2000 to June 2006 while Cunningham

4

worked in the Pipe/Machinery Department from April 2006 to December 2006. (R295:6,9). Additionally, Hedgeman worked in the HVAC Department at Austal's former facility in Chickasaw, Alabama and not at its main facility in Mobile, Alabama during much of his employment. (R373:2-3;Tr1000).

Another example of Appellants' inaccurate factual statements and the district court's summary judgment orders relates to their contentions concerning the termination of Austal's former Human Resources ("HR") Director, Jeff O'Dell. (Appellants' Br., p.34). The district court did not consider this evidence in deciding the Non-Trial Plaintiffs failed to establish reasonably severe or pervasive harassment, and this has no bearing on the Non-Trial Plaintiffs' appeal.[2] Similarly, O'Dell never testified at the trial of Carter's and Hedgeman's claims, and there was no evidence whatsoever presented to the jury concerning O'Dell's separation from Austal.[3]

---

[2]    The only arguable relevance of O'Dell's separation would be to demonstrate Austal's response to allegations of sexual harassment. In deciding whether the Non-Trial Plaintiffs alleged severe or pervasive racial harassment, the district court did not evaluate Austal's response to harassing conduct, sexual or otherwise. In fact, the only remedial effort by Austal that the district court noted was that Austal promptly removed graffiti and conducted an extensive investigation of the break room noose incident. The district court noted this evidence in weighing the reasonable severity of racial graffiti and a noose that was seen during an extensive investigation and not for purposes of deciding Austal's liability.

[3]    O'Dell did not testify at trial (contrary to Appellants' Br., p.76), and Appellants made no effort to introduce this irrelevant evidence at trial. Appellants'

Further, Appellants manipulate the record below by including in their record excerpts documents that were never presented to the district court.  For example, Appellants cite to and include entire deposition transcripts despite having previously filed only excerpts with the district court.  (*E.g.*, *compare* R285-10 at vol. 41 and 42 of Appellants' record excerpts (171-page Cunningham deposition) *with* R285-10 filed in district court (38-page Cunningham deposition)).  Appellants also cite pages 112-113 of Pratt's deposition (Appellants' Br., p.65) when those pages were never presented to the district court.  (R285-17).  Moreover, with respect to Carter's appeal of the jury's verdict, Appellants improperly cite to Carter's deposition testimony, which was not presented to the jury, instead of his trial testimony.  (Appellants' Br. p.75).  Consequently, Austal and the Court are burdened with researching each of Appellants' citations and record excerpts to determine which records and testimony were in fact presented to the district court, or in Carter's case, the jury.  Appellants' misrepresentations and manipulation of the record below render all of their citations and the arguments supported by those citations inherently unreliable.[4]

---

attempt to inject this evidence into this appeal is an improper attempt to prejudice the Court against Austal.

[4]     Contemporaneously herewith, Austal has moved to strike (i) all records included in Appellants' record excerpts that were not presented to the district court and all arguments supported by such records, and (ii) all citations to Carter's deposition testimony and arguments supported by those citations.

6

### A.    <u>Non-Trial Plaintiffs</u>

In their brief, Appellants repeatedly misstate deposition testimony concerning their respective alleged hostile environments, and they omit significant evidence critical to analyzing the totality of the circumstances concerning their employment.  The Non-Trial Plaintiffs provided the following evidence in support of their hostile environment claims:

### 1.    *Jerome Pettibone*

Pettibone was employed by Austal for nearly three and one-half (3 ½) years and primarily worked in the Aluminum/Fabrication Department.  (R202-2:10;R295:29).   During this 3 ½-year period, Pettibone never once heard a Caucasian employee use the "N" word even though he made a contrary allegation in his sworn EEOC charge.  (R202-1:62-63).   Moreover, contrary to Appellants' brief, Pettibone was never once (much less regularly) subjected to racially derogatory comments.  In fact, Pettibone testified that on one occasion, one of his co-Plaintiffs and two unidentified individuals told him about an incident where a supervisor remarked, "[a] lot of hard work with cheap slave labor done."  (R202-1:51-52).   Pettibone never testified that he perceived this comment to be discriminatory or that he was offended by it.  (*Id*.).   He did speculate that the individuals who heard the statement directly would have been offended.  (R202-1:52).

7

Similarly, Pettibone was "aware" that Tim Clemens allegedly kicked co-Plaintiffs Roberson and E. Adams in the foot only because he heard the allegation from his co-Plaintiffs. Further, although Appellants argue that Pettibone saw Confederate flag displays "all over," Pettibone testified to only three instances. (R202-1:63-64).

The only arguably threatening alleged harassment that Pettibone was aware of consists of one noose that Pettibone saw in the break room (R202-1:70), one noose that he did not see but heard about from E. Adams (R342-2:29-30), and one stick figure with the "N" word written on it that Roberson found and showed Pettibone. (R202-1:75-76). It is undisputed that these instances occurred over a 3 ½-year period and that Austal employees promptly investigated these incidents. (R202-3:35-36; R339-4:3-10;R342-2:32).

Moreover, with respect to the break room noose, this incident must be considered in context.[5] The break room noose was discovered on May 1, 2008 by co-Plaintiff B. Thomas. It was reported to Austal management and was promptly and thoroughly investigated. (R215-4:40;R284-8:14,16;R342-4:5-7). It is undisputed that Austal reviewed security tapes, interviewed numerous witnesses, notified the Mobile Police Department, contacted the FBI, and offered a reward to

---

[5] This is true for Pettibone and any of the Non-Trial Plaintiffs who allege awareness of the May 1, 2008 break room noose (hereafter the "break room noose").

8

anyone who came forward with information. (*Id*.). Due to Austal's investigation, the break room noose became common knowledge and was even reported by the local media.[6] (R170-1:58).

Although Pettibone generally alleges regularly seeing racial graffiti in the restrooms, when asked in his deposition he identified only the five (5) statements reported in his EEOC charge and two others asserted in his interrogatory responses. (R342-1:3,¶8;R202-1:57-58,69). Pettibone testified that he saw these statements in the men's restroom stalls. (R202-1:58-59). Many of Pettibone's co-Plaintiffs, some female, filed their EEOC charges on the same day as Pettibone and allege seeing the exact same 5 instances of graffiti in the men's restroom stalls. (R209-3:9,¶8;R214-4:3,¶8;R215-4:3,¶8;R333-1:2,¶8;R336-1:3,¶8;338-1:3,¶8;343-1:3¶8). Pettibone acknowledged that he did not know who was responsible for any of the alleged graffiti. (202-1:56-57,59). Additionally, it is undisputed that once reported, graffiti was promptly removed or painted over. (R202-1:57-62,70).

---

[6]    Appellants argue in their brief at pp. 36-37 that Austal management (O'Dell and Friedlieb) accused Pettibone of hanging the break room noose to bolster his lawsuit. In fact, Pettibone testified that it was other employees who believed he participated in hanging the noose. (R202-1:73). However, after a thorough investigation, Austal determined that the two employees who allegedly discovered the noose, B. Thomas and Pettibone, were responsible for hanging it. (*Infra*, at p.42-43). Thus, Pettibone's testimony that his co-workers who were not involved in the lawsuit also suspected him is consistent what Austal learned during its investigation.

9

Further, at some point, Austal painted the restroom walls black to deter and minimize graffiti.  (R202-1:56).

Finally, Pettibone presented no evidence that any of the harassment Pettibone alleges interfered with his job performance.  To the contrary, Pettibone received seven raises in 3 ½ years and several favorable reviews, including reviews commenting on his improving performance and positive attitude toward his job.  (R202-1:19-21,82-89;R295:29 ).

### 2.    *Larry Laffiette*

Laffiette worked primarily in the Aluminum/Fabrication Department from January 2006 to May 2009.  (R209-1:4;R295:21).  During that time, Laffiette once *possibly* heard "leadman" Bryce Goram ask, "Where you been at, Nigger."  (R209-1:27).  Contrary to Appellants' assertion, Laffiette did not affirmatively testify that he heard Goram say the "N" word and he never reported the statement "because . . . I wasn't sure if he said it or not [and] because I couldn't really make out what he said."  (R209-1:27-28,30).    Additionally, three of Laffiette's Caucasian supervisors/leadmen allegedly called him "boy" in what he described as a "playing gesture."  (R209-1:30-36).  Laffiette never reported the statements.  (*Id.*).

Laffiette also claims that he saw Caucasian co-workers wear Confederate flag clothing (R209-1:44), and a photograph of the break room noose that

10

Laffiette's co-Plaintiff Barnes showed him.[7]  (R209-1:38-39).  It is undisputed that Austal promptly removed and investigated the noose.  (R202-3:35-36;R215-4:40;R284-8:14,16;R331-2:19;R342-4:5-7).

Although Laffiette generally alleges regularly seeing racial graffiti in the restrooms, when pressed in his deposition he identified only the 5 statements that he and the other Non-Trial Plaintiffs reported to the EEOC.  (R209-3:9,¶8;R285-13:59-63).  Laffiette saw just one statement more than once.  (R285-13:59-63,65-67).  Laffiette also saw a photograph of one other statement that an African-American showed him.  (R285-13:61-62).  Laffiette acknowledges he does not know who is responsible for any of the graffiti.  (R331-2:20).  Additionally, it is undisputed that graffiti was removed or painted over once reported and at some point Austal painted the restroom walls black to deter and minimize graffiti. (R209-1:40,42;R331-2:20).

Finally, Laffiette presented no evidence that any of the harassment interfered with his job performance.  To the contrary, in 3 ½ years, Laffiette received four pay raises and several favorable reviews, including reviews commenting on his improving performance and willingness to follow instruction.  (R209-1:47-48,50;R295:21).

---

[7]    Appellants incorrectly assert that "Laffiette was also aware of *nooses* being found in the workplace."  (Appellants' Br., p.41)(emphasis added).  Laffiette testified that he was aware of only the break room noose.  (R209-1:39).

### 3.    *Tesha Hollis*

Hollis worked primarily in the Aluminum/Fabrication Department from June 2006 until May 2009 when she was terminated for failing a random drug test. (R170-1:5-8;R295:17).   Hollis never heard anyone at Austal use the "N" word during those three years.  (R170-1:60).   However, she allegedly heard about a Caucasian supervisor, who was not her supervisor, calling "black people monkeys."   (R285-11:53).   Hollis also allegedly once heard a Caucasian supervisor, who was not her supervisor, call a co-worker on the radio to "send the monkeys over here to clean up" and "plenty of times" heard co-workers and supervisors "whether they're playing or not" refer to African-American employees as "boy."  (R285-11:53,55).  No racially or hostile discriminatory comments were ever directed at Hollis.  (R170-1:53).

Hollis once saw graffiti inside the men's restroom.   (R170-1:41-45,52). With the encouragement of some of her co-Plaintiffs, Hollis went inside a men's restroom to see a drawing of a woman.  (R170-1:41-42).  While she was inside the men's restroom, Hollis allegedly saw the drawing and racially offensive statements scribbled on a wall inside a stall and on a Lysol can.  (R170-1:42-45).  Hollis believes the drawing was racially offensive and that the drawing and two of the statements were directed at her.  (R170-1:41-42).  It is undisputed that once reported, the graffiti was promptly removed or painted over and never reappeared.

12

(R170-1:51-52).  In fact, at some point the restroom walls were painted black to deter and minimize graffiti.  (R202-3:7-8).

Hollis claims that she saw the Confederate flag on shirts, "little rags," and welding caps (focusing almost exclusively on her co-worker Sam Peach).  (R170-1:56-58).

Hollis was allegedly aware of the break room noose and a noose made out of scrap aluminum that co-Plaintiff Roberson found and showed to her.  (R170-1:49;R329-2:15-17).  Hollis also claims to have seen a supervisor kick Roberson's foot.  (R170-1:53).

Finally, Hollis presented no evidence that any of the alleged harassment interfered with her job performance.  To the contrary, in three years Hollis received five pay raises and several favorable reviews, including reviews commenting on her improving performance.  (R170-1:72,74;R295:17).

### 4.    Alvin Cunningham

Cunningham worked at Austal for eight months from April 2006 to December 2006 in the Pipe/Machinery Department.  (R174-1:12,35;R295:9).  In those eight months, no racial comments were directed at Cunningham.[8]  (R174-

---

[8]    Appellants argue that Cunningham was called the "N" word.  (Appellants' Br., p.45).    Contrary to their assertion, Cunningham testified that no racial comments were made "[d]irectly to me, no."  (R174-1:42).

1:42).   However, Cunningham allegedly occasionally heard racial comments directed at other African-Americans.  (R174-1:37,42,51-52,61).

Cunningham also claims that he saw Caucasian co-workers wear Confederate flag clothing but could not recall a single employee.  (R174-1:52).

Cunningham allegedly once saw Jeremy Hull swing a noose in front of him. (R349-2:5).  However, Cunningham said Hull was "just playing ... silly" and he described Hull as his "somewhat ... best friend."  (R349-2:6).

Although Cunningham alleges regularly seeing racial graffiti in the restrooms, when pressed for details, Cunningham identified only 6 instances, 5 of which included the 5 statements that he and the other Non-Trial Plaintiffs reported to the EEOC.[9]   (R285-10:22-25;R349-1:3,¶10).   He was unable to provide any details concerning this graffiti-- e.g., when he saw it, which restroom, whether he reported it.  (R285-10:23-25).  Cunningham acknowledged that he did not know who was responsible for any of the graffiti.  (R285-10:21-22).

Finally, Cunningham presented no evidence that any of the alleged harassment interfered with his job performance.  To the contrary, Cunningham received a $1.50/hour pay raise after just one month of employment.  (R174-1:65).

---

[9]    Most of the Non-Trial Plaintiffs filed their EEOC charges on November 13, 2006.     (R209-3:9,¶8;R214-4:3,¶8;R215-4:3,¶8;R333-1:2,¶8;R336-1:3,¶8;338-1:3,¶8;R342-1:3,¶8;R343-1:3¶8).   Cunningham, however filed his charge on May 30, 2007.  (R349-1).  Nevertheless, Cunningham reports in his EEOC charge the exact same 5 instances of graffiti that his co-Plaintiffs reported.

### 5.    *Frederick Williams*

Williams worked at Austal from January 2006 to March 2007 in the Fabrication Department.  (R215-1:3,5;R295:41).  During that time, no one at Austal ever said anything to Williams that he considered to be racially discriminatory and he never heard any Caucasian employee use the "N" word. (R215-1:37;R328-2:9).

Williams saw one Caucasian co-worker wear a Confederate flag shirt more than once.  (R215-1:43).

Williams alleges that coordinator Scott Pearson once "got in my face, less than an inch from my lips, screaming and hollering at me telling me that he wasn't a goddamn racist."  (R215-1:11-12,37).  No other Caucasian employee directed hostile conduct to Williams personally.  (R215-1:37).

Although Williams generally alleges regularly seeing racial graffiti in the restrooms, aside from the same 5 statements Williams and the other Non-Trial Plaintiffs reported to the EEOC (R215-4:3,¶8), Williams identified only one instance where he allegedly saw his supervisor Chris Robinson write "porch monkeys" on a wall of one of the ships.  (R215-1:6,21).  When confronted by Williams, Robinson erased the phrase.  (*Id*.).  Williams never saw anyone else write on the walls and does not know who is responsible for any other graffiti. (R328-2:7-8).

15

Finally, Williams presented no evidence that any of the alleged harassment interfered with his job performance.  To the contrary, in 14 months, Williams received three raises and several favorable reviews, including reviews commenting that he was a "good worker."  (R215-1:61,63-64).

### 6.    Nathaniel Reed

Reed was employed for two and one-half (2 ½) years from November 2004 to June 2007 in the Aluminum/Fabrication Department.    (R213-1:4,42-43;R295:30).  In the entire time that he was employed, Reed never once heard a Caucasian employee use the "N" word even though he made a contrary allegation in his sworn EEOC charge.  (R213-1:31;R336-1:3,¶8).  However, Reed claims that he once heard his supervisor jokingly say to him "Hurry up, boy."[10]  (R213-1:20;R336-2:17).  Reed claims that he heard that co-Plaintiff B. Thomas was once called a "black bitch" and B. Thomas once told him that his supervisor used the "N" word at a party outside of work.  (R285-19:2).

Further, although Appellants argue that Reed saw Confederate flag clothing daily, Reed could recall only three employees he saw wearing such clothing. (R213-1:20,25-27).

---

[10]    Reed never complained to anyone other than the supervisor himself even though Reed stated that he would have gone to his manager if he thought he was subjected to some discriminatory act by a supervisor.  (R336-2:17-18).  Thus, whether this remark was racially motivated is doubtful.

16

Although Reed generally alleges regularly seeing racial graffiti in the restrooms, when pressed for specific information Reed testified, "I can't remember the exact words at the time." (R213-1:21). Instead, Reed provided only general testimony about the same 5 statements that Reed and the other Non-Trial Plaintiffs reported to the EEOC. (*Id*.;R.336-1:3,¶8). Reed does not know who is responsible for any of the graffiti. (R336-2:13). Additionally, it is undisputed that once reported, each item of graffiti was removed or painted over (R213-1:23-24,38), and that at some point the restroom walls were painted black to deter and minimize graffiti. (R202-3:7-8).

Finally, Reed presented no evidence (because none exists) to the district court that any of the alleged harassment interfered with his job performance. To the contrary, in two years, Reed received three pay raises and several favorable reviews, including reviews commenting on his improving job performance." (R213-1:42-43,45).

### 7.     Ron Law

Law was employed for two and one-half (2 ½) years in the Aluminum/Fabrication Department. (R204-1:3-4). In 2 ½ years, Law allegedly once heard someone request for "monkeys" to be sent[11] (R204-1:10-11) and once

---

[11]     Contrary to Appellants' argument, Law does not know if the employee was a lead man/supervisor, Caucasian, or referring to African-Americans. (R204-1:11-12).

heard an employee on a different crew use the "N" word.[12]     (R204-1:22-23).
Law's co-Plaintiff Roberson allegedly told him about supervisor Tim Clements
climbing and swinging through the rafters on the ship making monkey noises.
(R204-1:24-25).   Law once asked Australian coordinator Scott Pearson if "any
black people live in Australia" and "[h]e said, yeah, they Aborigines [and] told me
they're cannibals, they eat people."  (R285-14:57-58).  Law did not testify that any
of the comments were directed at him.

Law also claims that he saw Clements kick co-Plaintiff Roberson's foot.
(Appellants' Br., p.54).    Further, although Appellants argue that Law saw
Confederate flag clothing and belt buckles "all the time," Law could recall only
two instances. (R204-1:33-34). Moreover, Law admitted that the Confederate flag
"didn't bother me, one way or the other ...."  (R204-1:34).

Law allegedly saw the break room noose, saw a photograph of a noose on a
co-worker's phone, heard about one noose (he could not recall when or where the
noose was found or even who told him about the noose), and saw one stick figure
with the "N" word written on it that co-Plaintiff Roberson found and showed to
him.  (R204-1:37-42).  It is undisputed that these instances occurred over a 2 ½-

---

[12]     Law acknowledges that Austal terminated the employee for making the
statement.   (R204-1:23).   Additionally, contrary to Appellants' assertion, Law
testified this was the only time heard the "N" word at Austal.  (R204-1:22-23).

year period and that the displays Law could identify were promptly removed and investigated. (R202-3:35-36;R339-4:3-10).

Although Law generally alleges regularly seeing racial graffiti in the restrooms, when asked in his deposition Law testified only about the 5 statements that Law and the other Non-Trial Plaintiffs reported to the EEOC. (R285-14:63-66;R343-1:3,8). Law also alleges seeing graffiti on the ships, but when pressed concerning what he saw Law testified "I can't say word for word, but there were racial slurs." (R285-14:68). Law acknowledged that he does not know who is responsible for any of the alleged graffiti. (R285-14:66-67). Additionally, it is undisputed that once reported, each item of graffiti was promptly removed or painted over (R204-1:28,29,31-32), and that the restroom walls were painted black to deter and minimize graffiti. (R202-3:7-8).

Finally, Law presented no evidence that any of the alleged harassment interfered with his job performance. To the contrary, in 2½ years, Law received three raises, several favorable reviews, including reviews commenting on his positive attitude and quality of work, and was promoted to the lead person position. (R204-2:2;R204-3:2-15;R343-2:4;R295:22).

### 8.    *Carolyn Slay*

Slay worked primarily in the Electrical Department from November 2005 to March 2008. (R295:34;R333-2:14). In 2 ½ years, Slay never heard racial

19

comments directed at her.  (R333-2:5).  In fact, Slay is allegedly aware of only two racial comments.[13]  First, Slay claims that she once heard someone on the radio ask for "monkeys" to be sent to help clean something.  (R285-21:48-49).  However, contrary to Appellants' argument, Slay does not know if the person was a supervisor, Caucasian, or referring to African-Americans.  (R285-21:49-50).  Second, an African-American co-worker, allegedly told Slay that Caucasian supervisors, who were not Slay's supervisors, once made derogatory remarks about African-American employees. (R285-21:75-78).

Further, Slay alleges she saw Confederate flag displays "every day."  (R285-21:51-52,54).

Slay allegedly saw one stick figure with a noose and the "N" word written on it that co-Plaintiff Roberson found and showed her.[14]  (R285-21:139-140). This was an isolated incident that occurred over a 2 ½-year period, and it is undisputed that it was promptly investigated.  (R202-3:35-36;339-4:3-10).

---

[13]    Appellants assert that Scott Pearson and other Caucasian supervisors verbally harassed Slay and other African-American employees. (Appellants' Br., p.58).  However, Appellants provide no evidence that Pearson's (or any other supervisor's) comments were racial.  (*Compare* Appellants' Br., p.58 *with* R285-21:89-94).  Appellants also allege that Slay's tools were vandalized.  (Appellants' Br., pp.58-60).  Appellants have offered no evidence establishing that the alleged vandalism was racially motivated.  (R285-21:66-72,85-86,89-94,118,127-129).

[14]    Appellants' contention that Slay saw the break room noose is patently untrue.  Slay admits that Austal terminated her nearly six weeks earlier on March 25, 2008.  (Appellants' Br., pp.55-56;R333-2:14).

Although Slay generally alleges regularly seeing racial graffiti, Slay describes only two items that she personally saw. (R285-21:41,45,66,82-83). All other instances occurred inside the men's restroom; Slay became aware of the graffiti only because co-Plaintiffs Pettibone and Johnson photographed it and emailed Slay the pictures "[e]very week, maybe."[15] (R285-21:40-43,52). At some point the restroom walls were painted black to deter and minimize graffiti. (R202-3:7-8).

Finally, Slay presented no evidence that any of the alleged harassment interfered with her job performance. To the contrary, in 2 ½ years, Slay received five pay raises and her supervisors noted that she showed "big improvement." (R218-1:40-42;R295:34).

### 9.     *Gloria Sullivan*

Sullivan has been employed from September 2003-present in the Logistics/Warehouse Department. (R214-1:3;R295:36).

Although Sullivan frequently observed African-American employees use the "N" word, she never once heard a Caucasian employee use the slur.[16] (R214-1:84-

---

[15]     Although she claims she found the graffiti in the photographs offensive, Slay never asked her co-Plaintiffs to stop e-mailing her the photographs. (R285-21:42-43).

[16]     Sullivan may have once six years ago heard a co-worker (maybe Caucasian maybe African-American) use the "N" word "[m]aybe in a joking manner." (R214-1:84-85).

85).    Sullivan allegedly heard Caucasian employees refer to African-American employees as "boy" "[t]hroughout her employment at Austal" and Wilber Lee call co-Plaintiff F. Thomas "boy" and "Darth Vader" "on several different occasions."[17]   (R214-1:86;R285-24:3).    Sullivan also "knows" that her co-Plaintiff Johnson was called "boy" because he told her about the incident.    (R285-24:3).    Other employees, including co-Plaintiff Hedgeman, told Sullivan John Highland used the "N" word and that he did not like African-Americans on his crew.[18]    (R214-1:82).    Sullivan was also aware that Marlon Thrash once saw a Caucasian employee wearing a bandana with an image of the Confederate flag.    (R285-24:3).

---

[17]    Appellants repeatedly cite Sullivan's declaration (R285-24) that she executed nearly one and one-half years after her deposition.  (Appellants' Br., pp.60-63).   The obvious purpose of the declaration was to allege new facts to support Sullivan's hostile environment claim in an effort to survive summary judgment.   It is unlikely that Sullivan's memory of events that allegedly occurred in 2008, the year before her deposition, suddenly improved in 2011, a year and a half after her deposition.   Furthermore, during his deposition, F. Thomas never once testified that Lee called him "Darth Vader," and there is no evidence that this is a racial comment.

[18]    Appellants also argue the incidents referenced in their brief at pp. 60, 62-63 support Sullivan's claim.   Appellants, however, fail to provide any evidence that these incidents were racially motivated.   Indeed, the district court considered the alleged statements and concluded "there is no indication of a racial element." (R420:n.9).

Sullivan was allegedly aware of three alleged nooses found at Austal in 2008 that she neither saw nor mentioned during her two-day long deposition.[19]  (R214-1;1-128;R285-24:2-3).   It is undisputed that the alleged nooses were promptly removed and investigated.  (R202-3:35-36;339-4:3-10).

Although Sullivan generally alleges regularly seeing racial graffiti, Sullivan admits that she never personally witnessed the graffiti.   (R214-1:87,89-93). Instead, she was made aware of the graffiti only because co-Plaintiffs Pettibone, F. Thomas, and Johnson showed her photographs of graffiti they had taken on their camera phones and because other co-workers told her about it.  (R214-1:87-88). Sullivan was unable to recall a single racially offensive statement during her deposition.[20]  (R214-1:89-93).  Furthermore, at some point the restroom walls were painted black to deter and minimize graffiti.  (R202-3:7-8).

Finally, Sullivan presented no evidence that any of the alleged harassment interfered with her job performance.  In fact, Sullivan received ten pay raises and

---

[19]     Surprisingly, nearly a year and a half later when Sullivan executed her Declaration (R285-24) her memory of the events improved such that she not only remembered three noose incidents but also remembered how upset two of the incidents made co-Plaintiffs Pettibone and Johnson.

[20]     In her declaration provided a year and a half later, Sullivan recalled with specificity roughly eleven racial statements allegedly scribbled in the men's bathroom.  (R285-24:2).

even served as step-up supervisor.  (R214-1:113,115,117,119,121,122,124;R222-1;R295:36).

### 10.    Nelson Bumpers

Bumpers worked in the Aluminum/Fabrication Department for five and one-half (5 ½) years from November 2000 until June 2006 when he was terminated. (R167-1:10-11,53;R295:6;R350-2:3).

In 5 ½ years, Bumpers allegedly twice heard racial comments -- two references to "blue gums."  (R167-1:16-17,39-40).  Bumpers once overheard "Joe" and an "Australian guy," "talking about, I don't know, blue gums, black people and stuff like that, you know."  (R167-1:16-18).  Bumpers also claims that "Joe" "asked me did I know there was a tree called blue gum" and when Bumpers told him no, "Joe" allegedly "said it was something about black people gums or something not being pink or something.  I don't know." (R167-1:19).  Bumpers is not aware of any other racial comments.[21]  (R167-1:39-40).

Bumpers allegedly saw co-workers wear Confederate flag clothing "numerous times."  (R167-1:42-43).  However, Bumpers could not identify a single incident and, contrary to Appellants' argument, never testified that he was aware of "guys [wearing clothing with Confederate flag images] walking in the

---

[21]    Appellants argue that Bumpers "was also aware of Caucasian employees being allowed to use the word "nigger" in the workplace . . . ." (Appellants' Br., p.64).  However, Bumpers never testified that he heard the "N" word while at Austal.  (R167-1).

yard and nothing was ever done about it." (*Compare* Appellants' Br., p.64 *with* R167-1:41-43).

Bumpers alleges that he was aware of only the May 2008 break room noose. (R167-1:9).  However, Bumpers did not work at Austal in May 2008.  It is undisputed that his last day of employment was in June 2006.  (R167-1:53;R350-2:3; Appellants' Br., p.63).

Although Bumpers generally alleges regularly seeing racial graffiti in the men's restrooms, when pressed for specific information Bumpers provided only conclusory testimony that he saw graffiti "all the time" and that "it was all over the [restroom] walls."  (R167-1:41).  Bumpers provided no facts to support his conclusory allegations.  (*Id.*).  Further, it is undisputed that once reported, each item of graffiti was painted over (*id.*), and that the restroom walls were painted black to deter and minimize graffiti.  (R202-3:7-8).

Finally, Bumpers presented no evidence that any of the alleged harassment interfered with his job performance.  To the contrary, in 5 ½ years, Bumpers received five raises and his supervisors noted that he "consistently puts in" and was "[o]ne of Jeremy's best guys."  (R167-1:46-50).

### 11.    Rahman Pratt

Pratt was employed for seven months from April 2006 to November 2006 in the Aluminum/Fabrication Department.  (R205-1:4;R295:30).  During his seven

months at Austal, "no white employee made a racially discriminatory comment directly toward -- to me [Pratt], personally[.]"  (R205-1:21).  However, Pratt once heard "monkeys" and the "N" word when he overheard an unidentified Caucasian employee tell two other unidentified Caucasian employees (none of whom supervised Pratt) "[h]ow him and the nigger got into it yesterday, and he'll hang that nigger and shoot that nigger, and all that kind of stuff . . . and calling them 'monkeys' and stuff like that"; the employees were not on Pratt's crew and the comment was not directed at Pratt.  (R205-1:22,24,31-32).

Pratt allegedly saw "several" Caucasian employees wear Confederate flag clothing.  (R205-1:32-33).  However, Pratt only recalled "Charles Billy Graham" allegedly once wearing a shirt and bandana with the Confederate flag.[22]  (*Id.*).

Although Pratt generally alleges regularly seeing racial graffiti in the men's restrooms, when asked in his deposition Pratt admitted that he never saw several of the statements he reported in his EEOC charge, contrary to Appellants' representation to this Court.  Of the seven incidents that Appellants allege Pratt witnessed, Pratt specifically denied seeing the statements " 'White Power' with a hooded klansman" and "See, niggers travel in a pack just like monkeys." (*Compare* Appellants' Br., pp.65-67 *with* R285-17:36-37).  Also, although he was

---

[22]    Austal never employed an employee with the last name "Graham" and the first name "Billy," "Charles," or "William."  (R295:14).

allegedly aware of graffiti on certain toolboxes, he did not testify that he was aware of graffiti written on *African-American* employees' toolboxes as Appellants argue. (*Compare* Appellants' Br., p.66 *with* R285-17:28-29).  Furthermore, Pratt resigned from Austal before co-Plaintiff Matthews' radio was allegedly vandalized with racial slurs.  (R205-1:4;R206-1:13).  Pratt acknowledged that he does not know who is responsible for any of the graffiti.  (R337-2:10).  Pratt further testified that the graffiti was removed or painted over (R205-1:26-30), and the restroom walls were painted black to deter graffiti.  (R202-3:7-8).

Finally, Pratt presented no evidence that any of the alleged harassment interfered with his job performance.  To the contrary, in seven months, Pratt received one raise and one "pretty good" evaluation.  (R205-1:12).

### 12.    Franklin Thomas

F. Thomas worked in the Site Services Department for five and one-half (5 ½) years from October 2003 until July 2009 when he was terminated for fighting with one of his co-Plaintiffs.  (R212-1:3,52-61).  In 5 ½ years, F. Thomas allegedly heard racial comments on four occasions.  (R212-1:26-29,50).  First, although he testified he repeatedly heard African-American employees use the "N" word (R212-1:42-43), F. Thomas only once heard a Caucasian employee use the slur when leadman Michael Bolin used it in reference to an African-American

27

employee.[23]  (R212-1:26-27,42).  F. Thomas confronted Bolin and asked him not to repeat the slur.  (R212-1:27).  Bolin never again used the "N" word."  (R212-1:27,42).

Second, supervisor David Abear once said, "Hey, Frank, I told you I'm not racist, at home I have a color TV."[24]  (R212-1:26).   F. Thomas told Abear not to make anymore "racist comments" and Abear never made another racial comment. (R212-1:26).

Third, John Pitts once referred to F. Thomas as "boy."[25]  (R212-1:27-28).  F. Thomas asked Pitts not to call him "boy" and Pitts complied.  (R212-1:28). Fourth, F. Thomas once heard someone on the two-way radio ask supervisor Roy Hall to send over one of his "monkeys."[26]  (R212-1:50).

F. Thomas allegedly saw numerous employees wear Confederate flags on clothing, welding shields, and "on the back window of a vehicle" but when asked to identify the employees, he could recall only one, Sam Peach. (R212-1:44-45),

---

[23]     F. Thomas never testified that Bolin was his leadman.  (R212-1:26-27,42).

[24]     F. Thomas never testified Abear was his supervisor.  (R212-1:26).

[25]     Contrary to Appellants' assertion, F. Thomas was not "frequently" referred to as "boy"; F. Thomas testified that he was referred to as "boy" only once. (R212-1:27-29).

[26]     When asked who made the comment, F. Thomas testified:  "That, I do not know.  I don't know who made the comment."  (R285-26:62).

Although he generally alleges regularly seeing racial graffiti in the men's restrooms, F. Thomas did not personally see several of the alleged items, but rather, only learned about them from co-Plaintiffs Pettibone and Barnes.[27]  (R212-1:34-41).  F. Thomas acknowledged that he does not know who is responsible for any of the graffiti.  (R212-1:33-34).  He further testified that once reported, each item of graffiti was promptly removed or painted over (R212-1:35-40), and that the restroom walls were painted black to deter and minimize graffiti.  (R212-1:32-33).

Finally, F. Thomas presented no evidence that any of the alleged harassment interfered with his job performance.  To the contrary, in 5 ½ years, F. Thomas received nine pay raises, including a merit increase, and supervisor Wilber Lee acknowledged that "Franklin has made a 100% turnaround" and manager Wayne Stoner recognized F. Thomas's "effort/experience."  (R212-1:52-53,55-59,61;R295:37).

### 13.    *Robert Adams*

R. Adams worked in the Outfit/HVAC Department for nearly two years from June 2006 to April 2008 when he was terminated for failing a random drug test.  (R161-1:3,2-3,7-8;R295:2).  During his nearly 2-year employment, R. Adams allegedly overheard Caucasian employees using the "N" word amongst themselves

---

[27]    F. Thomas never testified that he saw "too many niggas in the warehouse" as Appellants allege.  (R212-1:34-41).

a "few times."  (R161-1:14-15).  R. Adams provided no testimony that any employee ever directed the "N" word or any other racial slur at him or any other African-American.  (*Id*.).

R. Adams claims that he is aware of the break room noose because a co-worker told him about the incident.  (R161-1:27-28).  However, R. Adams did not work at Austal on May 1, 2008.  (R161-1:3;R295:2).  In fact, as Appellants acknowledge, R. Adams's last day at Austal was April 29, 2008, several days before the break room noose incident.  (Appellants' Br., p.71).

Further, although R. Adams allegedly saw displays of the Confederate flag, R. Adams could not identify or describe a single person or incident except to say that "white guys" displayed the image on their clothing and toolboxes.  (R161-1:21).

Although he generally alleges regularly seeing racial graffiti in the men's restrooms, when pressed for specific facts, R. Adams testified "I can't remember all the stuff I saw" but the ". . . N word was used repeatedly.  I saw KKK  . . . [H]angman nooses drawn on the walls."  (R161-1:19).  R. Adams acknowledges that he does not know who is responsible for any of the alleged graffiti.  (R161-1:20).  Additionally, it is undisputed that once reported, each item of graffiti was promptly removed (R161-1:19-20) and that the restroom walls were painted black to deter and minimize graffiti.  (R161-1:20;R202-3:7-8).

30

Finally, R. Adams presented no evidence that any of the alleged harassment interfered with his job performance.  To the contrary, in nearly two years, R. Adams received three raises and several favorable reviews, including reviews commenting on his respectfulness, work ethic, improving and excellent performance, and stating that he "is one of my best men [and] will become a great leadman/supervisor."  (R161-3:2-3;R161-4:2;R161-16:2-7;R295:2).

B.    **Trial Testimony**

At trial (and contrary to Appellants' brief at pp. 76-77), Austal flatly denied the allegations by Carter and Hedgeman.  Appellants misstate that Austal admitted these allegations and improperly refer the Court to numerous exhibits and testimony from the summary judgment record that were not presented at trial and have no relevance to the present appeal.

1.    *Sidney Hedgeman*

Hedgeman worked in the Fit Out/HVAC Department at Austal over two periods:  December 2005 to August 2007 (Tr994;Tr1010;Tr1040) and January 2008 to May 2009.  (Tr1005;Tr1052).  In three (3) years, Hedgeman received five pay raises and several favorable reviews, including reviews commenting on his good attitude, work ethic and quality.[28]

---

[28]    (Tr1013-Tr1014;Tr1017-Tr1023;Tr1035-Tr1036;Tr1038-Tr1039;Tr1047; Tr1049-Tr1051).

During his more than 3 years at Austal, Hedgeman testified that he heard his co-worker, Blanchett, use the "N" word and "monkey." (Tr995-Tr996). He also testified that he once heard his supervisor, James Sullivan,[29] use the term "monkey" and that another supervisor at the Chickasaw facility referred to him as "boy." (Tr999-Tr1000). Hedgeman testified that he was aware of one noose-- the break room noose. (Tr1056). Hedgeman became aware of the noose because a co-worker showed him a picture on a camera phone. (Tr1056).

It was undisputed at trial that Austal conducted an extensive investigation of the break room noose. (Tr716;Tr735;Tr738-Tr743; *see also* Tr976). Austal's Director of Security, Bob Friedlieb, testified that Austal conducted 26 witness interviews, studied electronic turnstile records of who entered the facility around the time the noose was discovered, contacted the Mobile Police Department and the FBI, and offered a $20,000 reward to anyone who came forward with information concerning who was responsible for the noose. (*Id*).

Hedgeman also testified that he saw regular racial graffiti in the restrooms, although he was only able to recall three instances. (Tr1001). However, each item

---

[29]    Hedgeman acknowledged that while he was on medical leave Sullivan called him several times to check on him and that he appreciated that. (Tr1040). In fact, it was Sullivan who helped Hedgeman return to his position once his health improved, and it was Sullivan who Hedgeman contacted in 2009 after he was laid off to help him return to work at Austal. (Tr1643-Tr1644).

of graffiti was promptly removed or painted over (Tr905-Tr906) and the restroom walls were painted black to deter and minimize graffiti.  (Tr905).

## 2.    Frederick Carter

Carter worked in the Warehouse Department as a supervisor for almost six (6) years beginning in January 2003 until October 2008.  (Tr888;Tr985).  Carter received several favorable reviews and pay raises increasing his pay from $9/hour to $22/hour.  (Tr941;Tr948-Tr953;Tr961;Tr964).

During his nearly 6 years of employment, Carter repeatedly heard African-American employees use the "N" word, but he does not find that offensive. (Tr977-Tr978).  Carter provided no testimony at trial that he ever heard a Caucasian employee use the "N" word.[30]  (Tr914-Tr918).  The only racial comment that Carter allegedly heard during his nearly 6 years at Austal consists of once overhearing Caucasian supervisor Roy Howell state on the radio:  "Send a monkey over to the scaffolding yard."  (Tr917).

---

[30]    Appellants surreptitiously cite Carter's deposition to support their allegation that "Carter witnessed Caucasian employees and supervisors using the 'N' word [and] that Wilbur Lee, warehouse coordinator, called Franklin Thomas, African-American, 'spook' and 'Darth Vader' numerous times."  (Appellants' Br., p.75). Carter offered no such testimony at trial.  (Tr887-Tr989).  Furthermore, F. Thomas never made such allegations in his deposition, which is completely devoid of the terms "spook" and "Darth Vader."  (R212-1:1-50).  Again, Appellants' citations to the record concerning evidence that was not presented to the jury are improper and should be disregarded.

Carter testified he was aware of two nooses, neither of which he personally observed. (Tr907;Tr912-Tr913;Tr969-Tr970). First, Carter testified that a co-worker told him about a noose discovered in the warehouse. (Tr907). Carter acknowledged that this noose was investigated and that warehouse coordinator Jerrod Bradford and HR coordinator Stephanie Pate met with each warehouse employee, including Carter, and instructed that nooses or any racial harassment would not be tolerated. (Tr970-Tr971). Each employee, including Carter, signed a memo acknowledging the meeting and their understanding of Austal's zero tolerance policy against racial harassment. (Tr909;Tr909;Plf's Ex. 61;Tr971-Tr974).

Second, Carter testified that he is aware of the May 1, 2008 break room noose because he saw photographs of the noose at his lawyers' office and because he saw pictures of it on his co-Plaintiffs' camera phones. (Tr912-Tr913;Tr974;Tr986). As discussed, *supra*, at pp.41-43, it was undisputed at trial that Austal conducted an extensive investigation of the break room noose. (*See also* Tr974-76).

Finally, Carter testified that he saw racial graffiti the "entire time" he was at Austal but recalled only five specific incidents.[31] (Tr902-Tr904). Carter admitted,

---

[31]    Appellants cite Carter's deposition to support their claim that Carter is aware of "bomb threat graffiti" written on restroom walls. (Appellants' Br., p.75). Again, Carter offered no such testimony at trial. (Tr887-Tr989). Additionally,

however, that once reported each item of graffiti was promptly removed or painted over (Tr905-Tr906) and that the restroom walls were painted black to deter and minimize graffiti. (Tr905). Additionally, Carter testified that Austal's placement of monitors in the doorway areas of the men's restrooms minimized the graffiti in the restrooms. (Tr980-Tr981).

### 3.     *Austal's Evidence*

Austal presented the following evidence at trial either (i) to dispute the alleged harassment and/or challenge its alleged severity or pervasiveness, or (ii) to support its defense to liability by demonstrating that it took reasonable steps to prevent or promptly correct harassing behavior and that Carter and Hedgeman failed to take advantage of preventive or corrective opportunities Austal provided.

### i.     <u>*Terri Lindley*</u>

Lindley worked for Austal as an HR associate and then HR coordinator from September 2004 through the present. (Tr1489-Tr1490). Lindley testified that at all relevant times Austal maintained a written anti-harassment/discrimination policy. (Tr90-Tr91;Plf's Ex. 64).[32] The policy prohibited racial harassment and

---

Carter never testified that he saw "send all the niggers back to Africa." (*Compare* Appellants' Br., p.74 *with* Tr903).

[32]     Plaintiff's Exhibit 64 is excerpts from Austal's 2004 employee handbook. Excerpts from Austal's 2005-2007 handbooks were introduced as Plaintiff's Exhibits 65,68, and 70. (Tr96-Tr100,Tr103).

set forth Austal's mandatory reporting procedure pursuant to which employees who witnessed harassment were required to report the harassment to their supervisor or coordinator. (Tr91-Tr93;Tr1495-Tr1497). Lindley explained that Austal had multiple channels for reporting harassment and advised employees that in addition to reporting to their supervisor or coordinator, employees could report harassment to HR pursuant to HR's "open door policy." (Tr1496-Tr1497).

Lindley conducted the new employee orientation sessions. (Tr1492). During orientation, Lindley trained all employees on Austal's anti-harassment/discrimination policy and reporting procedures and required employees to sign an acknowledgement verifying their receipt and understanding of the policy. (Tr1493-Tr1496;Tr1502;Tr1507;Def's Ex. 15-A;Tr1543. Anti-harassment/discrimination training was also provided to and required for supervisors. (Tr1506-Tr1510).

Lindley testified that she "walked the yard" often to make sure that employees became familiar with her and felt there was a strong HR presence. (Tr1497-Tr1498). Although Austal employed 150 to 2,200 employees from 2004 to present, she personally knew both Carter and Hedgeman. (Tr1489;Tr1498-Tr1499). In fact, Carter visited HR on an almost weekly basis to deliver supplies. (Tr1499). Neither Carter nor Hedgeman ever complained to Lindley of racial harassment. (Tr1498-Tr1499). Additionally, Lindley testified that there were

36

several African-American supervisors, some of whom worked in Hedgeman's department, who were available to Carter and Hedgeman to discuss concerns about harassment.  (Tr1519-Tr1521;Tr1526).

Lindley explained that pursuant to Austal's progressive disciplinary procedure and depending on the severity of the misconduct, an employee who engaged in racial misconduct was subject to discipline which could include a written warning, unpaid suspension, or termination.  (Tr1502-Tr1503).  Although neither Carter nor Hedgeman was aware of the incident (and Hedgeman was not even working for Austal), they were permitted to introduce evidence at trial that in 2004 a Honduran employee, Carlos Sanchez, tied a string into a noose knot during a safety meeting that an African-American attended.  (Tr215).  Lindley testified that two Austal coordinators, Harley Combs and Dave Grouden, investigated the incident by interviewing several witnesses, including Sanchez and the African-American in the meeting.  (Tr215-Tr216).  During his interview, Sanchez stated that he had been a fireman in Honduras and had learned to tie various knots. (Tr216).  He stated that he did not understand the racial implications of a noose in the southern United States and that he believed he was just showing others his knot-tying capabilities.  (*Id*.).  The African-American interviewed stated that he believed Sanchez's explanation, was not offended by the string noose, and did not want Sanchez to be disciplined.  (*Id*.;Tr1696-Tr1697).  Considering the

37

circumstances, Austal counseled Sanchez and issued him a written Record of Warning and suspended him without pay for the day. (Tr216;Tr1696-Tr1697).

Additionally, although neither was aware of the incident, Carter and Hedgeman also introduced evidence at trial that in April 2008, Manny Rodriguez tied a noose and waved it in front of an African-American employee. (Tr237-Tr238; Tr1503). In contrast to the Sanchez incident in 2004, Lindley testified that after investigating the Rodriguez incident, Austal determined that Rodriguez had engaged in racial harassment and terminated him the same day.[33] (*Id.*).

### ii.    *Harley Combs*

Combs has been employed by Austal since 2001 and is currently the Aluminum Manager overseeing fabrication and welding employees. (Tr1659). He was hired in 2001 and in approximately 2003 became a supervisor in the fabrication department. (Tr1660;Tr1663-Tr1664). Combs testified that when he was promoted to supervisor he attended diversity awareness training that all

---

[33]    Appellants' Brief makes reference to multiple alleged nooses, some which Carter and Hedgeman were not aware of and occurred when they were not even working for Austal and some which were not "nooses" at all. For example, Lindley testified that in 2009 Austal received a report of a "noose," but after investigating, Austal determined that it was not a noose but a bowline used by crane and rigging employees to move equipment. (Tr1530-Tr1535). In fact, during the course of Austal's investigation one of the Plaintiffs whose claims were tried with Carter's and Hedgeman's, Carlos Johnson, provided a written statement that he did not believe the bowline was a noose. (Tr1533-Tr1535).

members of management were required to attend. (Tr1665-Tr1666). The training was repeated on a regular basis for all supervisors. (Tr1666). Combs testified that he attended the same training once he was promoted to coordinator/foreman.[34] Combs testified that he never used a racial slur and race was never a factor in any employment decision he made while working for Austal. (Tr1669-Tr1670). He further testified that he did not permit anyone who worked for him to engage in this type of discrimination and that he never witnessed a supervisor use a racial slur. (Tr1669-Tr1671). Combs testified that he knew both Hedgeman and Carter and that neither had ever complained to him about racial graffiti or harassment. (Tr1675-Tr1676;Tr1699-Tr1700).

Combs described the environment at Austal as similar to a construction site. (Tr1671-Tr1673). He testified that he had seen graffiti of all kinds, both racial and non-racial. (Tr1673). The racial graffiti was directed at African-Americans and Caucasians. (*Id*.). Combs testified that if he saw or someone reported to him offensive graffiti, he reported it to his boss or HR and notified Site Services to remove it. (Tr1673). Racial graffiti was always promptly painted over or removed. (Tr1673-Tr1674). Additionally, Combs testified that in approximately 2003, Austal posted a written memo in the restrooms cautioning employees that graffiti was prohibited and could result in termination. (Tr1676). Further, in

---

[34]    The titles coordinator and foreman are synonymous. (Tr1663).

approximately 2006, Austal distributed a written memo to all employees stating "[n]o graffiti.  This can result in written warning or dismissal," and employees were required to sign the memo.  (Tr1677-Tr1678).  Combs had numerous discussions with his employees and asked his supervisors to discuss with their crews that graffiti would not be tolerated.  (Tr1678-Tr1679).

### iii.    Bob Friedlieb

Friedlieb has been Austal's Director of Security since 2005.  (Tr716).  He testified that he is aware of all types of graffiti (non-racial and racial) and concerning the obligation to report graffiti.  (Tr727-Tr728).  Friedlieb testified that all graffiti was "obliterated, covered up, whatever means we can to get it off the bathroom walls. . . ."  (Tr727).[35]

Friedlieb also "walked the yard" and personally knew Carter.  (Tr728).  He testified that Carter never reported graffiti or other racial harassment to him.  (*Id*.).

Friedlieb testified concerning Austal's extensive investigation of the break room noose incident.  (Tr716;Tr734-35;Tr738-Tr743; *see also* Tr976) (conducted

---

[35]    During their case in chief, Carter and Hedgeman called Charles Stills, another Plaintiff whose claims were not being tried.  Stills was the warehouse supervisor and then coordinator from approximately 2003-2006.  (Tr 580-Tr581).  He testified that he was responsible for the cleaning crew and that his crew inspected and cleaned the restrooms twice daily and that he and Friedlieb attempted to document graffiti and removed or painted over it.  (Tr637-Tr641).  Stills further testified that at his suggestion the restroom stalls were painted black.  (Tr643-Tr644).  Carter corroborated Stills's testimony that the restroom stalls were painted black to deter graffiti.  (Tr979).

26 witness interviews, studied electronic turnstile records, Austal contacted the Mobile Police Department and the FBI, and offered a $20,000 reward).

### iv.    *Bob Browning*

Browning was a member of Austal's Board of Directors from 2003-2007, and he was Austal's CEO from August 2007 through August 2008.  (Tr1303-Tr1305).  Browning testified that when he became CEO in 2007, Austal was already conducting diversity awareness training (in addition to new employee orientation training) that all employees were required to attend.  (Tr1317-Tr1318;Tr1334).  He also testified that Austal already had an affirmative action program in place and that the policy included a utilization report that measured Austal's utilization (i.e., its success in meeting objectives to employ and promote minorities).  (Tr1317-Tr1318).  Browning testified that 32% of Austal's work force was African-American, a number that greatly exceeded utilization objectives.  (Tr1319-Tr1324).  Browning further testified to Austal's extraordinary efforts to recruit African-American employees by recruiting from predominantly African-American schools like Bishop State.  (Tr1324-Tr1328).  He testified that Austal's efforts to diversify and become an "employer of choice" were completely voluntary and not in response to the lawsuit inasmuch as they were in place well before the lawsuit.  (Tr1328).

Browning testified that in addition to regular training sessions, he held quarterly meetings that all employees attended. (Tr1310). He addressed graffiti during the quarterly meetings and instructed employees that any defacement of company property was prohibited. (Tr1312). He testified that Austal was not able to determine the perpetrators of any racial graffiti because every single employee was equipped with a sharpie marker and the graffiti was primarily inside the restroom stalls. (Tr1352-Tr1353). Browning testified that graffiti was promptly cleaned or painted over and that Austal eventually painted the stalls black to deter graffiti. (Tr1352-Tr1353).

Browning testified that he tried to go out in the yard almost daily so that employees would get to know him and to make sure the working environment was a safe one. (Tr1328-Tr1329;Tr1335). Browning personally knew Carter and testified that Carter never once complained to him about racial misconduct. (Tr1335).

Browning also testified concerning Austal's thorough investigation of the break room noose and testified the " 'results [of the investigation] are quite disturbing and point quite clearly toward a very small group of employees with a vested interest in painting Austal USA as having a discriminatory work environment.' " (Tr1329-Tr1334 (quoting Plf.'s Ex.35);Plf.'s Ex. 35).

Browning testified that he was referring to two of the Plaintiffs in the lawsuit.[36] (Tr1332-Tr1333).

### v.    Doug Boyce

Boyce is African-American.  (Tr1603-Tr1604).  He was hired in 2008 as the Site Services manager and is presently still employed by Austal.  (*Id.*).  As Site Services manager, Boyce oversees 80-85 employees responsible for maintenance, equipment repair, and cleaning.  (Tr1605)  Boyce testified that the restrooms are cleaned at least once daily.   (Tr1605-Tr1606).  Boyce instructs his crews that if graffiti is observed or reported it must be promptly painted over or removed.  (*Id.*). Boyce testified that he is aware of racial graffiti but it is not a daily occurrence. (*Id.*).

### vi.    Marcus Henson

Henson was hired in 2005 as a supervisor and in 2007 was promoted to coordinator, and he is still employed by Austal.  (Tr1610-Tr1611).   Henson testified that he received anti-harassment/discrimination training as a new employee and supervisor.  (Tr1616-Tr1617).  Austal instructed him to report racial graffiti to a manager or HR and to notify Site Services to remove it.  (Tr1611-

---

[36]    Austal's investigation revealed that the two Plaintiffs who allegedly discovered the break room noose, B. Thomas and Pettibone, were responsible for hanging it, but Austal was precluded from disclosing to the jury which two Plaintiffs were the culprits.  (Tr1332-1333).

Tr1612).  Since becoming coordinator, Henson has instructed supervisors who report to him to immediately report racial graffiti.  (Tr1616).  In addition to the routine anti-harassment training Henson received, following the break room noose incident, Harley Combs scheduled a meeting with all coordinators and Henson attended.  (Tr1617-Tr1618).  Following this meeting, Henson advised his supervisors of the incident and instructed them to notify management with any information concerning the perpetrator.  (Tr1617-Tr1618).

### vii.    *James Sullivan*

Sullivan has been a supervisor or foreman for Austal from 2004 to present. (Tr1638).  In 2007, he was foreman of the HVAC department and supervised Hedgeman.  (Tr1641;Tr1643).  Sullivan denied ever calling Hedgeman a "monkey" or using any racial slurs.  (Tr1642).  He further testified that Hedgeman never complained to him about harassment of any kind.  (*Id.*).  In fact, Sullivan testified that while Hedgeman worked for him, he recommended Hedgeman for a raise four or five times.  (Tr1643).  Sullivan also promoted four other African-Americans to supervisors.  (Tr1640-Tr1641).  Further, when Hedgeman went on medical leave, Sullivan promised Hedgeman he would make sure Hedgeman had a job when Hedgeman was able to return and called Hedgeman from time to time while he was out to check on him and make sure he was receiving his disability checks.  (Tr1643-Tr1644).  When Hedgeman wanted to return to work Austal was

44

not hiring, but Sullivan made sure Hedgeman got his job back because "I had told him that I would get his job back for him. So, I had to get his job back." (Tr1643). In 2009, after Hedgeman was no longer working for Sullivan, Hedgeman was laid off during a reduction in force. (Tr1643-Tr1644). Approximately three months after he was laid off, Hedgeman contacted Sullivan to see if Sullivan could help Hedgeman get rehired because Hedgeman wanted to return to work at Austal. (Tr1644).

Sullivan was trained on Austal's anti-harassment/discrimination policy and reporting procedure as soon as he was hired. (Tr1639). Sullivan testified that there was some racial graffiti in the restrooms, but that he did not see it more than once per month and that it was removed the same day. (Tr1640). To address graffiti, Sullivan held daily "start-up" meetings with his employees and instructed them that if anyone was caught writing graffiti "you're probably going to lose your job." (*Id*.)

### viii.    _Wilber Lee_

Lee has been employed as the warehouse coordinator since 2004.  (Tr1649).

He testified that he knows Carter and considers him a friend.  (_Id_.)  Lee flatly

denied ever calling Carter "boy" or using racial slurs.  (Tr1650).  He testified "I

might have used the word "son" because of my age, but never "boy."  (_Id_.).

## III.    Standard of Review

Austal accepts Appellants' statement of the standard of review applicable to

the district court's summary judgment orders and evidentiary rulings.  (Appellants'

Br., pp.88-89).

### A.    _Batson_ **Challenges**

The Court reviews a trial court's resolution of a _Batson_ challenge under the

clearly erroneous standard.    _Saunders v. Wal-Mart Stores, Inc._, 300 Fed. Appx.

697, 698 n.1 (11th Cir. 2008).

### B.    _Faragher_ **Defense And Rebuttal Witnesses**

A district court's rulings concerning whether an affirmative defense has

been waived and whether to permit rebuttal witnesses are reviewed for abuse of

discretion. _Proctor v. Fluor Enter., Inc_**.** 494 F.3d 1337, 1350 n.9 (11th Cir. 2007);

_Eades v. Ala. Dep't of Human Res._, 298 Fed. Appx. 862, 864 (11th Cir. 2008).

46

## C.    Jury Instructions

Provided the instructions do not misstate the law, the Court "applies a deferential standard of review to a trial court's jury instructions." *McCormick v. Aderholt*, 293 F.3d 1254, 1260 (11th Cir. 2002); s*ee U.S. v. Stearns*, 385 Fed. Appx. 885, 887 (11th Cir. 2010).  Under this standard, the Court " 'will only reverse the lower court because of an erroneous instruction if . . . left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.' "  *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 Fed. Appx. 565, 568 (11th Cir. 2009) (quoting *McCormick*, 293 F.3d at 1260).

## SUMMARY OF THE ARGUMENT

The district court, in determining whether any of the Non-Trial Plaintiffs established reasonably severe or pervasive harassment, properly considered the "totality of the circumstances" by applying the four well-settled factors to each Plaintiff's allegations.  Appellants grossly distort the meaning of "totality of the circumstances" and cite no authority for their proposed interpretation.  The crux of Appellants' argument is that the district court improperly declined to aggregate the allegations of all 23 Plaintiffs in the lawsuit in deciding whether an individual Plaintiff experienced reasonably severe or pervasive harassment.  However, while such so-called "me too" evidence may be admissible for other purposes in a race discrimination case (e.g., to rebut certain affirmative defenses), it is not admissible

47

to demonstrate that a plaintiff experienced reasonably severe or pervasive harassment, a necessary element in a prima facie claim for hostile environment.

Appellants' argument also fails because it is based on the false premise that all of their claims should be reviewed "through the lens of the plaintiffs' collective allegations" because all 23 Plaintiffs "worked in the same environment." (Appellants' Br., p.92). Appellants, therefore, erroneously conclude that it was arbitrary for the district court to hold that one Plaintiff established a fact issue concerning severe or pervasive harassment and another Plaintiff did not. In fact, the 23 Plaintiffs worked in different positions, different departments, different parts of the facility (or in some cases an entirely separate facility), and at different times over a roughly 8-year period. For each of the Non-Trial Plaintiffs, the district court properly determined that their allegations did not rise to the level of reasonably severe or pervasive harassment under Eleventh Circuit precedent. The district court's orders granting summary judgment in Austal's favor, therefore, should be affirmed.

With respect to Carter and Hedgeman, the district court properly exercised its discretion to limit the amount of "me too" evidence they presented at trial during their case-in-chief on the grounds that it was irrelevant or cumulative. However, the district court did not limit Carter and Hedgeman from presenting such evidence in their rebuttal case to challenge Austal's defenses to liability and

48

punitive damages. The record is clear that Carter and Hedgeman did not present any rebuttal evidence. Carter's and Hedgeman's challenges to the district court's evidentiary rulings, therefore, are not properly before this Court and should be disregarded. The remaining points of error alleged by Carter and Hedgeman are also without merit. Moreover, Carter and Hedgeman have not demonstrated that any alleged error at trial would have affected the jury's verdicts deciding all claims in Austal's favor. The jury's verdicts, therefore, should be affirmed.

## ARGUMENT AND CITATIONS TO AUTHORITY

In order to establish a prima facie claim for hostile environment, a plaintiff must demonstrate (1) he is a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment was severe or pervasive enough to unreasonably interfere with his work performance or to create an intimidating, hostile, or offensive work environment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Whitby v. Sec'y for the Dep't of Homeland Sec.*, 2012 WL 2504919, *4 (11th Cir. June 28, 2012); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). At summary judgment, Austal challenged only the fourth and fifth elements.[37] Notably, for the

---

[37]    In light of the established standard construing all reasonable inferences in a light most favorable to the non-movant, Austal conceded for purposes of summary

Non-Trial Plaintiffs, the district court did not consider the fifth element because it determined that these Plaintiffs failed to establish the fourth element -- that the alleged harassment was severe or pervasive. Because the district court's analysis stopped at the fourth element, it did not consider evidence and arguments relevant only to the fifth element.

**I.    The District Court Properly Declined To Aggregate All 23 Plaintiffs' Individual Allegations Of Harassment In Deciding Whether Each Of The Non-Trial Plaintiffs Reasonably Perceived The Alleged Harassment To Be Severe Or Pervasive.**

The district court properly held that for purposes of establishing the severe and pervasive element, "[t]o rely on the evidence, each [Plaintiff] must show that he *was aware* of those incidents at the relevant time he alleges the hostile work environment." (R369:n.4; R375:n.5; R376:n.5; R378:n.5; R379:n.5; R397:n.4; R420:n.8; R435:n.4; R436:n.6; R480:n.10; R488:n.5;R493:n.9;R513:n.6) (internal quotations omitted) (first alteration added). Thus, the district court considered each of the Non-Trial Plaintiff's cumulative evidence of harassment even if he was only aware of the incident via hearsay. (*E.g.*, R369:n.5;R375:n.6).

The district court's approach in this regard was proper under applicable Eleventh Circuit precedent. *Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1522 (11th

---

judgment only that the Non-Trial Plaintiffs satisfied the first three elements. With respect to the Trial Plaintiffs, Austal disputed at trial that many of the alleged harassment incidents occurred, and Austal ultimately received jury verdicts in its favor on all hostile environment claims. (R515;R718-R719).

50

Cir. 1995); *see also Melton v. Nat'l Dairy*, *LLC,* 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010).  Alleged discriminatory conduct the Non-Trial Plaintiffs were unaware of has no bearing on whether a particular Plaintiff reasonably considered his working environment to be abusive, offensive, or intimidating.  *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) ("[h]arassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive.")

    The Non-Trial Plaintiffs assert that the district court erred by declining to consider evidence of each Non-Trial Plaintiff's individual harassment allegations together with the other 22 Plaintiff's harassment allegations for purposes of measuring severity and pervasiveness without regard to his awareness of the allegations.  (Appellants' Br., p.92).  In essence, Appellants argue that each Non-Trial Plaintiff's "totality of the circumstances" includes any and all allegations of alleged harassment at Austal that spanned more than eight years.  Appellants cite no authority to support their boundless "totality of the circumstances" test (*see* Appellants' Br., pp.91-92), and, in fact, it is contrary to well-settled Supreme Court and Eleventh Circuit precedent.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993) (establishing four factors to be considered).

Accordingly, to the extent that a Plaintiff lacked knowledge of harassment alleged by other Plaintiffs, the district court properly declined to consider the evidence as part of the "totality of the circumstances" for that Plaintiff, and this Court should affirm the district court's judgment.

## II.    The District Court Applied The Correct "Reasonable Person In Plaintiff's Position" Standard.

The district court's review of each of the Non-Trial Plaintiff's evidence on the fourth element of their hostile environment claims included both a subjective and objective component:

> The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that 'a reasonable person would find hostile or abusive' and that 'the victim subjectively perceives ... to be abusive.'

*Mendoza*, 195 F.3d at 1246 (*quoting Harris*, 510 U.S. at 21).

With respect to the subjective component, the district court found that each of the Non-Trial Plaintiffs had carried their burden. (R378:13). With respect to the objective component, however, the district court found that each of the Non-Trial Plaintiff's evidence was lacking -- i.e., that no reasonable person in the Plaintiff's position would have perceived the harassment to be severe or pervasive.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the

circumstances.' " *Oncale v. Sundowner Offshore Servs., Inc.*, 532 U.S. 75, 81 (1998) (*quoting Harris*, 510 U.S. at 23).    The objective component is "fact intensive," and courts consider four factors when determining whether harassment objectively altered the employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246 (citing *Harris*, 510 U.S. at 23).    Courts consider the alleged conduct "in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive...." *Id*.    The above standard and factors were quoted nearly verbatim in the district court's orders, and this is the standard the district court applied in considering the Non-Trial Plaintiff's claims.    (R378:12-13).

In disagreeing with the district court's conclusion Appellants argue that the only way to rationalize it is that the district court must have assessed the evidence not from the standpoint of an African-American, but rather from the standpoint of a "Caucasian[…] in Mobile, Alabama."[38]    Appellants are grasping at straws.    They have not pointed to any language or finding in the district court's orders to even

---

[38]    Appellants insinuate, without support, that applying a reasonable person standard from the standpoint of a Caucasian in Mobile, Alabama as opposed to an African-American would have caused the district court to reach a different conclusion.    This is speculation and conjecture.

remotely suggest that the district court disregarded how the harassment would reasonably be perceived by an African-American in each Non-Trial Plaintiff's position.   To the contrary, the district court correctly stated that the objective component of the Non-Trial Plaintiffs' evidence of severe and pervasive harassment would be assessed from the standpoint of a reasonable person, listed each of the four *Harris* factors, and then applied the factors to each of the Non-Trial Plaintiff's allegations.  (R378:12-13).

## III.   The District Court Properly Considered The Totality Of The Circumstances For Each Non-Trial Plaintiff On An Individual Basis.

### A.   Appellants Distort The Meaning Of The "Totality Of The Circumstances" Test Beyond All Reasonable Recognition.

The "totality of the circumstances" test as applied by courts in hostile environment cases is designed to evaluate subjectively and objectively a plaintiff's work environment, not the work environment of a collection of employees who were employed at different times, in different departments, in different buildings and worked for different supervisors over an extended period of time.  The focus is on the cumulative alleged harassment a particular employee claims made his work environment hostile, whether it was direct or indirect.  *Reeves v. DSI Sec. Servs., Inc.,* 395 Fed. Appx. 544, 546 (11th Cir. 2010).  The Supreme Court in directing courts to "look at all the circumstances" explained that this requires consideration of (i) the frequency of the discriminatory conduct; (ii) its severity; (iii) whether it is

54

physically threatening or humiliating, or a mere offensive utterance; and (iv) whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. This is precisely the analysis that the district court performed. (*E.g.*, R378:12-13 (" 'The conduct is considered cumulatively instead of in isolation' " and applying four factors) (quoting *Reeves,* 395 Fed. Appx. at 546)).

Remarkably, Appellants argue that the district court erred because it declined to consider evidence of alleged incidents on a company wide basis that a particular Plaintiff had no knowledge of during his employment, as well as alleged incidents that occurred during times when that Plaintiff was not even employed by Austal. To accept Appellants' argument as correct means the district court should have considered as part of the "totality of the circumstances" for Sullivan whether Hedgeman's allegations of a racial slur made by his supervisor in the HVAC Department at Austal's former facility in Chickasaw made Sullivan's perception of a hostile environment in the Warehouse Department of Austal's Mobile facility objectively reasonable – notwithstanding that Sullivan never worked at the Chickasaw facility and never worked with Hedgeman's supervisor. It would mean that the district court should have considered whether the break room noose discovered by B. Thomas on May 1, 2008 created a hostile environment for Bumpers who stopped working for Austal on June 21, 2006 (R167-1:53) or for R. Adams who stopped working for Austal on April 29, 2008. (R161-1:7-8,10).

Appellants have not cited a single case-- and to Austal's knowledge there is not one-- to support their proposition that in applying the "totality of the circumstances" test, a court is required to consider alleged harassment of which the plaintiff is unaware. It is difficult to fathom how the Non-Trial Plaintiffs' expansive interpretation of the "totality of the circumstances" test is consistent with the *Harris* factors. Appellants provide no explanation whatsoever how alleged hostile conduct of which a plaintiff is unaware could be probative of whether he reasonably perceived the alleged harassment that existed in his work environment to be severe and pervasive. While such "me too" evidence may become admissible for other purposes in a race discrimination case, it has absolutely no relevance to the sole issue in the Non-Trial Plaintiffs' appeal-- whether a reasonable person would perceive as severe or pervasive the Non-Trial Plaintiffs' alleged harassment.

### B.    Appellants Have Not Established That "Me Too" Evidence Is Admissible To Establish The Non-Trial Plaintiffs Experienced Reasonably Severe Or Pervasive Harassment.

The authority Appellants cite as supporting the admission of "me too" evidence (i.e., alleged harassment of which the Plaintiff was not aware) for the purpose of establishing that the Non-Trial Plaintiffs reasonably perceived the harassment to be severe or pervasive is inapposite. Appellants rely primarily on the Eleventh Circuit opinions in *Mack v. St. Mobile Aerospace Eng'g., Inc.*, 195

56

Fed. Appx. 829 (11th Cir. 2006), *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261

(11th Cir. 2008), and *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991).

In *Mack v. St. Mobile Aerospace Eng'g., Inc*., a race discrimination case

involving seven plaintiffs, the court specifically noted that the plaintiffs alleged

"that they *personally witnessed* no less than seven nooses on MAE premises over a

two-year period from 2002-2003."   195 Fed. Appx. at 834 (emphasis added).

Thus, the court did not, as Appellants state, "group[...] the [p]laintiffs' evidence

together."  (Appellants' Br., p.95).  Further, unlike here, each of the plaintiffs in

*Mack* personally witnessed or was aware of the harassment alleged by the other

plaintiffs.   *Id*. at 834-36.   The error by the district court in *Mack* was not in

declining to consider additional incidents of which the seven plaintiffs were

unaware, but declining to consider the cumulative effect of each incident of

harassment of which each plaintiff was aware.   *Id*. at 838.   Indeed, the Eleventh

Circuit criticized the district court for evaluating the plaintiffs' evidence as

"isolated acts" and explained "[t]he prima facie showing in a hostile environment

case is likely to consist of evidence of many or very few acts or statements... which

taken together, constitute harassment....   [T]he jury does not necessarily examine

each alleged incident of harassment in a vacuum."   *Id*. at 838 (internal quotations

omitted).

As *Mack* demonstrates, a court may not carve out certain acts of harassment resulting in a selective application of the evidence. *Id*. at 838. The district court did not do so here and considered each Plaintiff's allegations in total. (R378:8-14). *Mack* did not address the present issue and, thus, is not helpful to the Appellants' argument.[39]

Similarly, *Goldsmith v. Bagby Elevator Co.* did not address the use of "me too" evidence for the purpose that Appellants offer it here -- to establish that the Non-Trial Plaintiffs demonstrated, as part of their prima facie case, objectively severe or pervasive racial harassment. In *Goldsmith*, the Eleventh Circuit reviewed the district court's admission of "me too" evidence at trial, not at the summary judgment stage. The court held that the "me too" evidence was admissible at trial to support "Goldsmith's claim that Bagby Elevator permitted a severe and pervasive atmosphere of racial discrimination on its premises." *Id.* at 1286. This is relevant to only the fifth element of a hostile environment claim-- whether the employer can be liable for the alleged harassment (i.e., whether the employer knew or should have known of the harassment and failed to take prompt remedial action). In the present case involving the Non-Trial Plaintiffs, the district court did not consider the fifth element because it determined that the Non-Trial Plaintiffs

---

[39]    As discussed, *infra*, at p.74-75, the allegations of harassment in *Mack* were more frequent and far more severe than the allegations of harassment by the Non-Trial Plaintiffs, and, therefore, *Mack* is also factually distinguishable.

failed to satisfy the fourth element.  (*See, e.g.,* R378:15).  Whether Austal permitted and can be liable for the alleged harassment has no bearing on whether the Non-Trial Plaintiffs first carried their burden of demonstrating the alleged harassment was so severe or pervasive that it altered their terms of employment or created a discriminatorily abusive environment.  *Goldsmith* does not support the consideration of "me too" evidence for this purpose.

     The *Goldsmith* Court further held that "me too" evidence was probative of several issues raised by Bagby Elevator either on cross-examination or as an affirmative defense.  *Id*. at 1286.  Specifically, the court held that the evidence was admissible to rebut the employer's good faith defense to punitive damages.  *Id*. at 1287.  These also are issues the district court did not consider in the present case because the district court's analysis stopped at the fourth element of the Non-Trial Plaintiffs' prima facie case.  Thus, while *Goldsmith* supports the admission of "me too" evidence to rebut certain defenses offered by an employer, it does not support allowing such evidence for the purpose Appellants propose here.[40]

---

[40]    The "me too" evidence presented in *Goldsmith* consisted of testimony by two other employees that the same supervisors who plaintiff-Goldsmith alleged used racial slurs and fired him also discriminated and retaliated against the other two employees.  *Id*. at 1286.  Accordingly, the third purpose for which the *Goldsmith* Court approved the admission of "me too" evidence was to prove the discriminatory and retaliatory intent of the two supervisors at issue in Goldsmith's claim.  *Id*.  This purpose also has no bearing on the district court's analysis of whether the Non-Trial Plaintiffs experienced objectively severe or pervasive harassment, and it does not support Appellants' argument.  It is noteworthy that the

Finally, *Busby v. City of Orlando* merely affirmed a point of law that is by now well settled -- the fact that a plaintiff does not personally witness a racial slur or epithet or that the slur or epithet is not directed at the plaintiff is not determinative of whether the plaintiff experienced racial harassment.[41]  *Id*. at 785; *Walker v. Ford Motor Co*., 684 F.2d 1355, 1359 n.2 (11th Cir. 1982).  This point has no bearing on the present issue inasmuch as the district court did not limit the Non-Trial Plaintiffs to presenting evidence of harassment that he personally witnessed or of which he was the target.  (*See, e.g*., R378:9 (permitting Pettibone to rely on hearsay concerning an alleged remark about "slave labor" and hearsay concerning an incident where one of Pettibone's co-Plaintiffs allegedly was kicked)).  To the contrary, the district court merely required that the Non-Trial

---

Non-Trial Plaintiffs presented no evidence to the district court and have presented none here concerning whether any of the alleged harassment was committed by supervisors common to the 23 Plaintiffs.  Indeed, the Non-Trial Plaintiffs have made no showing concerning exactly what "me too" evidence the district court erroneously failed to consider.

[41]     The "me too" evidence presented in *Busby* consisted of witness testimony about racial slurs concerning the plaintiff (Busby) that were made by several employees.  The Eleventh Circuit held that the fact that Busby did not personally hear the slurs should not have precluded the evidence since Busby still may have experienced harassment as a result of them.  *Id*. at 785.  This is inapposite to the present issue.  Further, the evidence in *Busby* included testimony by a co-worker that the same supervisor Busby alleged to have harassed her also discriminated against the co-worker.  The Eleventh Circuit held that this evidence was admissible to support Busby's claim that the employer permitted racial harassment.  *Id*. at 786.  Again, this purpose is relevant only to the element of employer liability and does not apply to the Non-Trial Plaintiffs.

Plaintiffs present evidence that they were aware of the alleged incident during their employment. Indeed, most of the alleged harassment complained of by the Non-Trial Plaintiffs was based on incidents they heard about from or photographs they were shown by their co-Plaintiffs in the course of discussing their lawsuit. The district court gave this fact little or no consideration and certainly did not preclude the Non-Trial Plaintiffs from relying on hearsay evidence. *Busby*, therefore, also is inapposite, and Appellants' reliance on *Busby* is misplaced.[42]

The authority from other circuits and district courts that Appellants cite also is unhelpful and merely holds, in accord with Eleventh Circuit law, that incidents of harassment need not be directed at the plaintiff in order for the plaintiff to rely on the incidents as proof of a hostile environment. *Ziskie v. Mineta*, 547 F.3d 220, 223-224 (4th Cir. 2008) (error for district court to exclude testimony by co-workers concerning sexist comments that although not directed at plaintiff, plaintiff overheard or was otherwise aware of); *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 697-98 (4th Cir 2007) (considering sexual remarks directed at plaintiff's teammates which were made in plaintiff's presence and frequently occurred during team meetings); *Hicks v. Gates Rubber Co*., 833 F.2d 1406, 1415-16 (10th Cir.

---

[42]    Appellants also cite *Lewis v. Dept. of Transp*., 187 Fed. Appx. 961 (11th Cir. 2006) at p. 98 of their brief. *Lewis* does not support admitting "me too" evidence to demonstrate the fourth element in a prima facie claim for hostile environment. *Lewis* involved the trial of a discriminatory promotion claim. In affirming the district court's exclusion of "me too" evidence at trial, the Eleventh Circuit merely noted in dicta that the plaintiff had not alleged hostile environment. *Id*. at 961.

1987)(a plaintiff may rely on harassment directed at other employees and citing two cases discussing that a plaintiff who is not the object of harassment may still have a claim if she works alongside others being harassed)[43]; *King v. McMillan*, 2008 WL 957877, *1 (W.D. Va. Apr. 8, 2008) (where plaintiff alleged that she was told by female employees that defying chief executive's sexual advances would jeopardize her career, and she knew other women were sexually harassed by chief executive, testimony by other women was admissible at trial).[44]  None of the Non-Trial Plaintiffs were precluded from presenting evidence of co-worker harassment

---

[43]    Both *Hicks* and Appellants (at p. 101 of their brief) cite *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971).  *Rogers* also addressed whether an employee could rely on harassment that although not directed at the employee, the employee was nonetheless aware of and held that an employee could rely on such evidence in her EEOC charge.  *Id*. at 238-39 (employee of optometrist could rely on alleged discriminatory practice against patients which required employee to segregate minority patients).

[44]    *King*, like several of the cases Appellants cite, involved "me too" testimony concerning harassment by the same supervisor.  As discussed and pursuant to *Goldsmith*, such evidence may be admissible to prove the supervisor's discriminatory intent or motive and to demonstrate the employer permitted the harassment or that its anti-harassment policy was ineffective.  This does not, however, support considering such evidence for purposes of deciding whether a particular plaintiff has alleged severe or pervasive harassment.  Moreover, the line of cases discussing "me too" evidence concerning the same perpetrator is factually distinguishable inasmuch as the Non-Trial Plaintiffs have not attempted to identify any of the alleged perpetrators of the harassment that are common to the various Plaintiffs.  Additionally, as Appellants acknowledge, Austal did not dispute at summary judgment whether the alleged harassment was racially motivated.

of which they were aware (R378:9), and the foregoing cases are unsupportive of

Appellants' argument.[45]

---

[45]    Appellants cite numerous cases from other jurisdictions in footnote 8 of their brief. (Appellants' Br., p.100, n.8). Some of these cases actually support Austal's position. *See, e.g., Williams v. Conagra Poultry Co.,* 378 F.3d 790, 794 (8th Cir. 2004) (incidents that plaintiff was not aware of were irrelevant to whether plaintiff experienced severe and pervasive harassment, but were relevant at trial as probative of employer's intent in firing plaintiff and to rebut employer's defense to punitive damages). In several instances, Appellants reference quotes by the court that are taken out of context and do not support Appellants' argument. *See, e.g., Howard v. Burns*, 149 F.3d 835, 838 (8th Cir. 1998) (discussing trial testimony concerning allegations of sexual harassment made by other women who communicated their complaints to plaintiff and of which plaintiff was aware in stating, "[w]e have considered harassment of employees other than the plaintiff to be relevant to show pervasiveness of the hostile environment."); *Delph v. Dr. Pepper Bottling Co., of Paragould, Inc*., 130 F.3d 349, 355 (8th Cir. 1997) (stating "entire hostile work environment" must be considered in context of evaluating whether certain allegations were time-barred because they pre-dated employee's EEOC charge by more than 180 days; hostile environment claim is continuing violation); *Phillip v. ANR Freight Sys., Inc.,* 945 F.2d 1054 (8th Cir. 1991) (case did not even involve hostile environment claim; involved trial of alleged age-based demotion under ADEA). The remainder of Appellants' authority either does not address the present issue at all or is inapposite to the Non-Trial Plaintiffs' appeal because the case merely held that incidents of which the plaintiff was unaware may be admissible at trial to rebut employer's defense to liability. *See, e.g., Jackson v. Quanex Corp.,* 191 F.3d 647, 650 (6th Cir. 1999); *Madison v. IBP, Inc.,* 257 F.3d 780, 793-94 (8th Cir. 2001); *Hurley v. Atl. City Police Dept*., 174 F.3d 95, 111 (3d Cir. 1999); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987), discussed, *supra*, at pp.61-62; *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), discussed, *supra*, at p.62 n.43; *Schwapp v. Town of Avon*, 188 F.3d 106, 111-12 (2d Cir. 1997); *Lehman v. Toys R. Us, Inc*., 626 A.2d 445, 457 (N.J. 1993).

**IV.    The District Court Correctly Held That The Non-Trial Plaintiffs Failed To Establish That The Alleged Harassment Was Severe Or Pervasive.**

Not all objectionable conduct or language amounts to discrimination. *Reeves v. C.H. Robinson World Wide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010). Title VII is not a "general civility code," and "simple teasing ... offhand comments, and isolated incidents (unless extremely serious)" do not constitute a hostile environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted).

As the Supreme Court explained in *Harris*:

> [M]ere utterance of an epithet which engenders offensive feelings in a employee . . . does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview."

510 U.S. at 21.

**A.    The Non-Trial Plaintiffs Failed to Establish Severe or Pervasive Harassment.**

The Eleventh Circuit has delineated the type of conduct that amounts to severe and pervasive harassment and the type that does not. Where the conduct occurs frequently or is severely offensive, the Eleventh Circuit has held the conduct is actionable. *Reeves*, 594 F.3d at 804 (evidence sufficient where employee claimed that her coworkers made obscene and derogatory comments

64

about her and women in general "on a **daily** basis"); *Webb v. Worldwide Flight Serv. Inc.*, 407 F.3d 1192, 1193 (11th Cir. 2005) (evidence sufficient where supervisor referred to plaintiff on a **daily** basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe"); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (evidence sufficient where co-workers called plaintiff "Wetback," "Spic," and "Mexican Mother F———," on a **daily** basis for entire month and used the derogatory terms "in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance or when they were arguing with him, were mad with him, or were taunting him.... ") (internal quotations omitted); *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) ("roughly fifteen separate instances of harassment over the course of four months" were actionably pervasive); *Dees v. Johnson Controls World Serv., Inc.*, 168 F.3d 417, 418 (11th Cir. 1999) (plaintiff demonstrated severe and pervasive harassment where plaintiff alleged "almost-**daily** abuse").[46]

Conversely, where the conduct occurs less frequently or is less severe in nature, the Eleventh Circuit has held the evidence is insufficient to establish a hostile environment. *Guthrie v. Waffle House, Inc.*, 460 Fed. Appx. 803, 807 (11th Cir. 2012) (evidence insufficient where plaintiff alleged few dozen comments or

---

[46]    (emphasis added in all).

actions, spread out over period of eleven months, that could arguably be construed as harassment); *McCann v. Tillman*, 526 F.2d 1370, 1378 (11th Cir. 2008) (four racial remarks in two-year period was "too sporadic and isolated" to support racial harassment claim); *Washington v. Kroger Co.*, 218 Fed. Appx. 822, 825 (11th Cir. 2007) (harassment not severe or pervasive where co-worker allegedly hung figurine representing the plaintiff by a rope and called plaintiff racially-suggestive names, including "boy"); *Barrow v. Ga. Pacific Corp.*, 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) ("displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker," as well as multiple threats to "kick [plaintiff's] 'black ass,' " and a threat by another supervisor that if plaintiff looked at a white girl he would "cut" him, together with the use of racial slurs including "nigger" and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment."); *Mendoza*, 195 F.3d at 1249 (five incidents in eleven months were "far too infrequent" to support a sexual harassment claim).

Using this framework, the district court considered the "totality of the circumstances" regarding each Non-Trial Plaintiff's evidence of alleged racial harassment that they were aware of either directly or indirectly during their employment. After weighing this evidence cumulatively, the district court

correctly held that these Plaintiffs failed to establish that the alleged harassment was objectively severe or pervasive enough to support their hostile environment claims as a matter of law.[47]

The district court's finding is amply supported by the record. First, the conduct the Non-Trial Plaintiffs describe was far more infrequent than the "daily" harassment the Eleventh Circuit has considered to be pervasive. For example, Pettibone[48] alleges that over a 3 ½-year period, he once heard from his co-Plaintiff that a supervisor made a remark concerning "cheap slave labor"; co-Plaintiffs, E. Adams and Roberson, told him that supervisor Tim Clements kicked them in the foot; on three instances he saw co-workers wear Confederate flag clothing; he is aware of two nooses (the break room noose which he saw and another noose that co-Plaintiff E. Adams told him about) and a stick figure with the "N" word written on it that co-Plaintiff Roberson found and showed to him; and "regular" racial

---

[47]    The district court cited *Barrow* in its summary judgment orders (R378:14-15), and Austal cited many of the cases discussed above in its summary judgment briefs. Thus, the benchmark the district court used is plainly apparent from even a cursory review of the summary judgment orders and Austal's briefs and is not "anyone's guess" as Appellants contend. (Appellants' Br., p.92).

[48]    Ideally, Austal would have analyzed each of the Non-Trial Plaintiff's allegations, but this is impractical given the word constraint. Austal chose Pettibone as an example because he is who Appellants selected as the "lead" of the Non-Trial Plaintiffs. Of the Non-Trial Plaintiffs, Pettibone's allegations are the most substantial, but still do not amount to severe or pervasive harassment under Eleventh Circuit precedent. Therefore, the lesser allegations by the other 12 Non-Trial Plaintiffs also are insufficient.

graffiti.   (R202-2:10;R285-16:35,39-51,59,64-65,68-70,75-76).   Aside from the graffiti, Pettibone's allegations demonstrate only the type of isolated, sporadic conduct occurring over a lengthy period that the Eleventh Circuit has held is too infrequent to be pervasive.  Indeed, in 3 ½ years Pettibone heard second-hand only one questionably racial remark and could only recall seeing Confederate flag clothing three times.  Further, the severity of the three racial displays that Pettibone alleges is significantly diminished because two of the incidents Pettibone learned of second-hand.   While Pettibone personally saw the break room noose, within moments, Austal security had secured the area and was investigating the incident.

Although Pettibone and most of the male Non-Trial Plaintiffs alleged regularly seeing racial graffiti in the men's restrooms, this general allegation is unsupported by specific facts and insufficient to establish frequency.[49]   When asked in their depositions, the Non-Trial Plaintiffs primarily relied on the exact same 5 items of graffiti reported in their nearly identical EEOC charges. Moreover, each one of the Non-Trial Plaintiffs testified that the graffiti was anonymous.  Further, nearly every one of the Non-Trial Plaintiffs admitted that the graffiti he saw was removed or painted over once Austal became aware of it (either

---

[49]    For the three female Non-Trial Plaintiffs (Hollis, Slay, and Sullivan), the graffiti was not a regular occurrence inasmuch as it was primarily in the men's restroom.  They only personally saw graffiti on one or two occasions and were aware of other graffiti because they viewed it on their co-Plaintiffs' camera phones.  (R170-1:18,41-45).

through routine inspections or because it was reported).[50]  (*See, e.g.,* R170-1:51-52;R202-1:57-62;R204-1:28,29,31-32).    For all Non-Trial Plaintiffs, it is undisputed that Austal painted the restrooms black to deter graffiti.  (R202-3:7-8).  The district court noted the removal of graffiti and the efforts to deter it in considering each of the Non-Trial Plaintiff's allegations of racial graffiti because this clearly minimizes the reasonable severity of the graffiti.    (*See, e.g.*, R378:11,13-15); *see also Mitchell v. Carrier Corp.*, 954 F. Supp. 1568 (M.D. Ga. 1995), aff'd 108 F.3d 343 (11th Cir. 1997),

In *Mitchell*, the court considered allegations in a multi-plaintiff race discrimination case similar to those made by the Non-Trial Plaintiffs and held that the allegations were not, as a matter of law, "egregious enough to create a hostile work environment."  *Id*. at 1578.  In reviewing the plaintiffs' allegations, the district court in *Mitchell* considered the "totality of the circumstances" for each plaintiff individually.  *Id*. at 1576-78.  The lead plaintiff alleged that during his eight years of employment he heard second-hand that his co-worker made a racist statement about him, he experienced racially motivated conflicts with co-workers, he saw rebel flags and "KKK" on company "packets", and he "always observe[d] racial graffiti in the restrooms" that stayed on the walls for months at a time.  *Id*. at 1574, 1576.  The employer moved for summary judgment.  *Id.* at 1572.  Upon

---

[50]    Only F. Williams and Cunningham dispute that the graffiti was promptly removed.

review, the district court held that "considering these incidents collectively, they simply are not 'sufficiently severe or pervasive' to create a hostile work environment." *Id*. at 1577. The district court explained:

> The severity of both the graffiti and the co-worker's statement is diminished by the circumstances of this case. **With regard to the graffiti, those responsible for the graffiti were unknown and the epithets were written, rather than spoken.** Likewise, although the racist statement repeated by Mitchell's [Plaintiff's] co-worker may have been directed at Mitchell, **the statement was only second-hand information.**
>
> The frequency of the graffiti is also unclear. Plaintiff has been employed by Carrier for approximately eight years. **Although Plaintiff attests that he always observes racist graffiti in the restrooms, he has reported only a few [four] specific instances**.
>
> Plaintiff has also failed to demonstrate that such conduct unreasonably interfered with his work performance. Plaintiff has only made general allegations about his diminished self-esteem and efficiency; he has failed to support these allegations with any specific examples of how this discriminatory conduct has had a deleterious effect on his performance. In fact, the evaluations of Plaintiff's work illustrate improved performance.

*Id*. at 1577-78 (emphasis added).

Accordingly, the district court granted summary judgment to the employer, and this Court affirmed the district court's ruling without opinion. *Id*. at 1578, aff'd 108 F.3d 343.

Similarly, the Non-Trial Plaintiffs' do not allege conduct that is either egregious or frequent enough to create a hostile environment. The alleged "regular" graffiti is nothing more than a general, conclusory allegation wholly

70

lacking factual support.  The remainder of the Non-Trial Plaintiffs' allegations involve isolated and sporadic incidents, many of which were experienced second-hand, that do not amount to severe harassment.  Indeed, the majority of the Non-Trial Plaintiffs allege racial comments they heard only second-hand and do not allege awareness of any arguably threatening or intimidating harassment (noose, stick figure, physical threats).  *Cf. Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299-1300 (11th Cir. 2012) (racial epithets directed at plaintiff, banana peels repeatedly placed on plaintiff's equipment, displays of the Confederate flag on co-workers' shirts and hats, and confrontation by two co-workers who asked plaintiff in a threatening manner if he had reported them as racists (one of the men was carrying a crowbar or other metal tool and both had been seen wearing displays of the Confederate flag) deemed severe and pervasive conduct).

While Laffiette, Law, and Sullivan allege awareness of a noose and/or the stick figure, they did not personally witness these displays and only heard about them or saw them on a co-Plaintiff's camera phone.  Additionally, as discussed, *supra*, the break room noose was thoroughly investigated by Austal and by virtue of the investigation, many employees became aware of it.  Indeed, Austal notified the Mobile Police Department and the FBI, and the break room noose was reported by the local media.  (R284-8:14,16;R285-21:141; R342-4:5-7).  The fact that many of the Non-Trial Plaintiffs are aware of the break room noose due to the publicity

71

caused by Austal's investigation significantly diminishes the reasonable severity of this incident.

Only Pettibone, Cunningham, Hollis, and Slay personally saw a noose or the stick figure. With respect to the stick figure and one of Hollis's two nooses, these Appellants only saw the displays because their co-Plaintiff, Roberson, made it a point to show it to them. (R170-1:67;R204-1:39-40;R202-1:75-76;R333-2:21). One stick figure or noose discovered by someone else is not reasonably severe or pervasive harassment. Likewise, Cunningham's "somewhat ... best friend" swinging a rope in front of him that could have been a noose is not reasonably threatening or intimidating harassment. Additionally, the single noose that Pettibone personally witnessed and the second of the two that Hollis personally witnessed was the break room noose, which they saw after Austal had secured the area and begun its investigation. Only Pettibone and Hollis allege personally seeing a second noose. When taken in context of their other allegations that occurred over a relatively lengthy (3 years or more) period, their allegations still do not reach the level of severe or pervasive harassment.

Finally, the Non-Trial Plaintiffs presented no evidence to establish that the alleged harassment altered or interfered with the terms of their employment. "The 'mere utterance of an ... epithet which engenders offensive feelings in a employee, ... does not sufficiently affect the conditions of employment to implicate Title VII.'

72

" *McCann*, 526 F.3d at 1378 (quoting *Harris*, 510 U.S. at 21). Only Sullivan provided any testimony-- albeit in conclusory fashion-- that the harassment "had a negative effect on my employment." (R285-24:2). However, conclusory statements of the elements are insufficient to survive summary judgment. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

Moreover, the record evidence establishes that any alleged harassment did not interfere with the Non-Trial Plaintiffs' employment. The Non-Trial Plaintiffs all received numerous pay raises and favorable evaluations throughout their employment. Not one of the Non-Trial Plaintiffs has pointed to any evidence to establish that the alleged harassment was so severe or pervasive that it altered the material terms of their employment. The Non-Trial Plaintiffs' complete failure to offer any evidence of this factor further supports the district court's ruling. *Mitchell v. Carrier Corp.*, 954 F. Supp. at 1577-78.

The district court, therefore, properly held that the Non-Trial Plaintiffs failed to establish severe or pervasive harassment, and its orders granting summary judgment should be affirmed.

**B.    The Non-Trial Plaintiffs' Allegations Are Distinguishable From *Mack*.**

Appellants argue that the Non-Trial Plaintiffs' allegations are more analogous to the allegations in *Mack* than in *Barrow*.  As discussed, *supra*, at p.57, the plaintiffs in *Mack* each personally witnessed seven nooses in a two-year period. *Mack*, 195 Fed. Appx. at 834.   None of the Non-Trial Plaintiffs personally witnessed or even heard about more than three nooses over a several-year period (e.g., Law and Pettibone).[51]  Thus, they alleged far fewer displays over a much longer period of time than the plaintiffs in *Mack*.  Moreover, each of the plaintiffs in *Mack* was the target of racial slurs.  *Mack*, 195 Fed. Appx. at 836.  In contrast, Pettibone, for example, was never the target of a racial slur and only heard about one isolated remark about "cheap slave labor."  (R202-1:51-52).  Law also was not the target of any racial slurs and only alleged to have overheard racially suggestive remarks (e.g., that the Aborigines in Australia are cannibals).  (R285-14:57-58). The only comparison between the Non-Trial Plaintiffs' allegations and the *Mack* plaintiffs' allegations is alleged regular racial graffiti.  The Non-Trial Plaintiffs'

---

[51]     Only Law was aware of three nooses over a 2 ½-year period (although he was unable to provide any details concerning two of the nooses).  (*See, supra*, at pp.18-19).  Law was aware of the nooses because he heard about them or saw pictures of them on his co-Plaintiffs' camera phones.  (*Id*.).  Pettibone personally saw two nooses (including the break room noose under investigation) and a stick figure over a 3 ½-year period.  (*Supra*, at pp.7-8).  The remainder of the Non-Trial Plaintiffs alleged even less frequent, less severe harassment than Law and Pettibone.

inability to provide any details concerning the alleged "regular" graffiti aside from the 5 statements they reported to the EEOC renders the regularity of the alleged doubtful.  *Mitchell*, 954 F. Supp. at 1577.  Moreover, nearly all of the Non-Trial Plaintiffs candidly acknowledge that Austal removed or painted over graffiti once it was reported.  This certainly minimizes the reasonable severity of racial graffiti. Additionally, graffiti in a bathroom is not tantamount to a racial slur or a noose in terms of severity.  The fact that graffiti was removed coupled with the infrequency of the other alleged incidents of harassment plainly distinguishes the Non-Trial Plaintiffs' work environment from the plaintiffs in *Mack*.

In sum, under the four *Harris* factors, the conduct alleged by the Non-Trial Plaintiffs falls short as a matter of law.  The district court's rulings granting summary judgment in Austal's favor, therefore, should be affirmed.

## V.    The District Court Did Not Consider Austal's *Faragher* Evidence Or Punitive Damages Defense In Deciding That The Non-Trial Plaintiffs Failed to Establish Severe Or Pervasive Harassment.

Appellants contend that the district court should have considered "me too" evidence in evaluating the Non-Trial Plaintiffs' claims because such evidence is admissible to rebut Austal's *Faragher* defense.   In making this argument, Appellants conflate the separate and distinct analysis concerning whether a plaintiff has presented sufficient evidence under the fourth element of a hostile environment claim to withstand summary judgment with whether a plaintiff has

75

sufficiently presented rebuttal evidence to withstand summary judgment on an employer's *Faragher* defense.[52]

The *Faragher* defense applies only to rebut the fifth element of a prima facie claim for hostile environment-- that the employer can be liable for the harassment. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007) (*Faragher* defense may be used to defeat element of employer liability). As Appellants note in their brief at p. 33, the district court ended its analysis with the fourth element and did not consider whether Austal could be liable for the alleged harassment. Thus, Austal's *Faragher* evidence had no application to the district court's analysis of the Non-Trial Plaintiffs' claims, and the district court did not consider this evidence in granting summary judgment. While Appellants are correct that *Goldsmith* supports that "me too" evidence is admissible to rebut a *Faragher* defense, this has no relevance to the Non-Trial Plaintiffs' grounds for this appeal.

Appellants' argument that "me too" evidence was admissible for the Non-Trial Plaintiffs to rebut Austal's good faith defense to punitive damages fails for

---

[52] Appellants' assertion that Austal's *Faragher* defense was not timely asserted is without factual or legal support. As an initial matter, Appellants did not raise this objection at the summary judgment stage. This was an afterthought asserted for the first time just prior to the trial of the Trial Plaintiffs' claims. The district court held that Austal timely asserted its *Faragher* defense by asserting failure to mitigate in its timely filed Answer. *See Howard v. City of Robertsdale*, 168 Fed. Appx. 883, 886 n.3 (11th Cir. 2006).

the same reason.  The district court did not reach the issue of punitive damages and did not consider Austal's "good faith" evidence in deciding the Non-Trial Plaintiffs failed to establish reasonably severe or pervasive harassment.

Appellants' argument that "me too" evidence was admissible to bolster the Non-Trial Plaintiffs' credibility is likewise inapplicable to the Non-Trial Plaintiffs. As Appellants note in another section of their brief, it is inappropriate for a district court to make credibility determinations at the summary judgment stage. (Appellants' Br., p.91 (citing *Anderson*, 477 U.S. at 249)).  The district court here construed all reasonable inferences in favor of the Non-Trial Plaintiffs, but they simply did not allege conduct that a reasonable person in Plaintiff's position would find severe or pervasive.  The district court's orders, therefore, should be affirmed.

## VI.    The District Court Did Not Err In Its Evidentiary Rulings Concerning "Me Too" Evidence At Trial.

### A.    The District Court Properly Limited The Amount Of "Me Too" Evidence Carter and Hedgeman Could Present In Their Case-In-Chief.

Appellants contend that the district court improperly excluded from evidence testimony by the 18 other Plaintiffs in the lawsuit whose claims were not tried in the first trial (i.e., "me too" evidence).  Appellants mischaracterize the district court's preliminary rulings on this issue and the evidence they were permitted to present.

Before trial, Austal moved the district court *in limine* to limit the "me too" testimony to only the five Plaintiffs whose claims were being tried in the first trial - - E. Adams, Barnes, Carter, Hedgeman, and Johnson (the "Trial Plaintiffs"). (R432). The district court denied Austal's motion and instructed:

> In plaintiffs' case in chief, the court will not allow testimony from any plaintiffs (not set for trial) regarding alleged racially discriminatory acts at Austal unless there has been evidence submitted at trial that one of the trial plaintiffs was aware of the discriminatory act during his employment at Austal AND the Defendant has challenged that the act occurred.

(R481).

In a subsequent order, the district court reiterated that its ruling was preliminary and also explained that because the Trial Plaintiffs' claims were being tried together, the jury would necessarily hear "me too" evidence during their case in chief:

> The Court excluded the "me too" evidence in order to prevent mini-trials on incidents not related to the [trial] plaintiffs and to prevent cumulative evidence. There are five [trial] plaintiffs which are expected to testify to numerous incidents, which if consistent with their deposition testimony, will cover more than a majority of the incidents that allegedly occurred throughout a very large facility over a period of two to four years. Moreover, as previously stated, if the defendant infers that the incidents did not occur, plaintiffs will be allowed to present additional evidence in support of their contention. To the extent that plaintiffs propose to offer testimony of racial slurs and other racial activity by supervisors and members of management who participated in promotion and pay decisions specifically related to the plaintiffs' remaining pay and promotion claims, the court will reconsider its ruling upon a proffer of this evidence at the close of trial on Monday, September 26.

78

(R496:2).

Thus, the district court did not preclude all "me too" evidence as Appellants argue. Each of the Trial Plaintiffs were permitted to testify about their direct and indirect knowledge of alleged harassment during their employment without regard to whether the other Trial Plaintiffs had any knowledge of these acts. Consequently, Carter and Hedgeman each presented "me too" testimony by four other Plaintiffs. Additionally, over Austal's objection, Carter and Hedgeman were permitted to call co-Plaintiff Charles Stills to testify concerning alleged discriminatory conduct in the Warehouse Department where Carter worked, including racial graffiti and racial slurs allegedly made by supervisors.[53] (Tr290-Tr295). Though not discussed in Appellants' brief, the only "me too" evidence Carter and Hedgeman were precluded from admitting in their case in chief concerned allegations of graffiti and racial slurs by the 17 other Plaintiffs that had nothing to do with Carter or Hedgeman or would have been cumulative of the testimony already presented. (Tr1192-Tr1207).

The federal rules of evidence authorize district courts to exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

---

[53]    The district court permitted all witnesses to testify about alleged slurs made by any employee who was a supervisor or higher. (Tr414).

wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"In deference to a district court's familiarity with the details of the case and its

greater experience in evidentiary matters, courts of appeals afford broad discretion

to a district court's evidentiary rulings." *Sprint/United Mgmt. Co. v. Mendelsohn*,

552 U.S. 379, 384 (2008). This is particularly true where the district court

determines that evidence is inadmissible because its probative value is outweighed

by the risks outlined in Fed. R. Evid. 403. *Id*. at 384. Therefore, this Court affords

high deference to the district court's evidentiary rulings and reviews the rulings

only for a clear abuse of discretion. *U.S. v. Tinoco*, 304 F.3d 1088, 1119 (11th Cir.

2002).

As demonstrated above, the district court permitted Carter and Hedgeman to

present "me too" evidence concerning alleged discriminatory conduct by their

supervisors. The Supreme Court has explained that "me too" evidence not

involving the same supervisor is neither *per se* admissible nor *per se* inadmissible

and must be considered in context of the plaintiff's claims:

> The question whether ["me too"] evidence of discrimination by other
> supervisors is relevant in an individual ADEA case is fact based and
> depends on many factors, including how closely related the evidence
> is to the plaintiff's circumstances and theory of the case. Applying
> Rule 403 to determine if evidence is prejudicial also requires a fact-
> intensive, context-specific inquiry. Because Rules 401 and 403 and
> do not make such evidence *per se* admissible or *per se* inadmissible.

*Mendelsohn*, 552 U.S. at 388; *see also Johnson v. Ala. Cmty. College Sys.*, 2011 WL 5078771 *1 (M.D. Ala. Oct. 25, 2011) (granting motion *in limine* to exclude "me too" evidence concerning other allegations of discrimination and prior lawsuits); *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144-45 (D.D.C. 2011) ("Factors that courts consider in the inquiry include (1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decision maker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated."); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004) (excluding evidence of another employee's charge of gender discrimination in gender discrimination case because court determined evidence had limited probative value on any issue material to plaintiff's case; evidence involved a different employment decision in different department made by different decisionmakers).

The district court clearly did not abuse its discretion in limiting the "me too" evidence involving various unrelated incidents of harassment that Carter and Hedgeman were unaware of or did not involve any of Carter's or Hedgeman's supervisors during their case-in-chief, and the district court's ruling should be affirmed.

**B. Carter And Hedgeman Did Not Offer "Me too" Evidence To Rebut Austal's Defenses And They Have Waived This Issue On Appeal.**

Appellants argue that Carter's and Hedgeman's "me too" evidence was also admissible to rebut Austal's purported "not me" evidence (Appellants' Br., pp.109-10) and Austal's *Faragher* defense.[54]   However, the district court did not limit Carter and Hedgeman from presenting "me too" evidence in their rebuttal case to challenge Austal's defenses.  (R481;R496).  Carter and Hedgeman elected not to do so.  (Tr1732).  Since Carter and Hedgeman were not limited in presenting rebuttal "me too" evidence, there is no ruling to appeal and, in any event, they made no offer of proof concerning what evidence they would have presented.[55]  (*Id.*)  As such, Carter and Hedgeman are precluded from raising on appeal any

---

[54]   Appellants describe testimony by Austal witnesses Aaron Bradley, Doug Boyce, and Marcus Henson as "not me" evidence and complain that the witnesses were previously undisclosed yet permitted to testify.  (Appellants' Br., pp.108-09).  Bradley, Boyce, and Henson were listed on Austal's pre-trial witness list and, moreover, were disclosed by the Plaintiffs throughout discovery.  (Tr1476-Tr1479).  Additionally, Carter and Hedgeman did not object to Bradley's testimony at trial, and this issue is not properly before the Court.  (Tr1281;Tr1476-Tr1479).  Further, the witnesses were not called to present "not me" evidence, but instead were called to rebut specific allegations by the Trial Plaintiffs concerning their discriminatory promotion claims or to demonstrate Austal's efforts to prevent and promptly correct discriminatory conduct.  (Tr1284;Tr1287;Tr1611-Tr1617;Tr1605).  To the extent any of the witnesses testified about the infrequency of racial graffiti or the absence of complaints of harassment, it was the *Plaintiffs* who elicited this testimony and opened the door to it.  (Tr1299;Tr1620-Tr1621;Tr1624-Tr1625).

[55]   The only proffer made by Carter and Hedgeman was during their case in chief.  (Tr1192-Tr1207).  Obviously, to permit evidence at that stage for the purpose of rebutting Austal's affirmative defenses would have been premature.

alleged error by the district court in excluding this evidence.  *Lanier Const., Inc. v. Carbone Prop. of Mobile, LLC*, 253 Fed. Appx. 861, 864 (11th Cir. 2007).

## VII.   Appellants Have Not Demonstrated Any of the District Court's Evidentiary Rulings Resulted In Reversible Error.

The Court "will not overturn an evidentiary ruling unless the moving party establishes a substantial prejudicial effect."   *Goldsmith*, 513 F.3d at 1276. Appellants have failed to establish that any of the district court's evidentiary ruling resulted in a substantial prejudicial effect.  *Id*.  Contrary to Appellants' arguments, as discussed, *supra*, at p.79, the district court allowed substantial "me too" evidence.  Despite the "me too" evidence from the 4 other Trial Plaintiffs and Stills regarding alleged graffiti, nooses, and the use of racial slurs, the jury nonetheless rejected Carter's and Hedgeman's claims.  A different outcome resulting from a new trial including cumulative and, at best, remotely relevant "me too" evidence is extremely unlikely.  *See Perry v. State Farm Fire & Cas. Co*., 734 F.2d 1441, 1446 (11th Cir. 1984) (unless admission of evidence would have affected the outcome of the case, there is no substantial prejudicial effect and absent such showing ruling will not be reversed).

Aside from their own speculation that the district court's evidentiary rulings must have influenced the jury's verdict, Appellants make no attempt to establish that the rulings resulted in a substantial prejudicial effect.  To the contrary, if

Carter and Hedgeman truly believed the excluded evidence would have influenced the jury's decision or negated Austal's defenses, presumably they would have offered such evidence when they had the opportunity in their rebuttal case.

The district court did not clearly abuse its discretion in limiting Carter's and Hedgeman's "me too" evidence during their case-in-chief and moreover, Appellants have not established that any alleged error in excluding the evidence resulted in a substantial prejudicial effect.    Therefore, the district court's evidentiary rulings should be affirmed.

## VIII. The District Court Did Not Abuse Its Discretion In Allowing Austal To Proceed With Its *Faragher* Defense.

Contrary to Appellants' argument, an employer that raises a general "failure to mitigate damages" defense asserts the *Faragher* defense despite not referring to *Faragher* by name.    *Howard*, 168 Fed. Appx. at 886 n.3 ("We agree with the district court that Robertsdale did not waive the *Ellerth-Faragher* defense by not referring to it by name in its Answer.    Robertsdale raised a general 'failure to mitigate damages' defense, which we conclude was sufficient to assert the *Ellerth-Faragher* defense.").    Here, Austal stated in its answer, "Subject to a reasonable opportunity to conduct discovery, some or all of Plaintiffs have failed to mitigate their damages."    (R38:250).    Thus, Austal clearly stated Appellants' "failure to

84

mitigate damages" as a defense in its Answer, and the district court did not abuse its discretion in finding that Austal timely asserted the *Faragher* defense.

Furthermore, an affirmative defense is not waived "if a plaintiff receives notice of [the] affirmative defense by some means other than the pleadings, [because] 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.' " *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989) (quoting *Hassan v. U.S. Postal Ser.*, 842 F.2d 260, 263 (11th Cir. 1988)).

Carter and Hedgeman had ample notice of Austal's *Faragher* defense. Austal relied on the *Faragher* defense in its motions for summary judgment (R201:14-17;R279:16-18), and Carter and Hedgeman contested the "affirmative defense" and specifically discussed the *Faragher* opinion in their response briefs. (R312:12,25-26;R321:14,29).  Carter even referred to what he contended Austal must do "in order to prevail on its affirmative defense." (R312:25).  Clearly, therefore, Carter and Hedgeman had notice of Austal's *Faragher* defense long before trial and were not prejudiced by the district court's decision to allow Austal to present this defense.  Accordingly, the district court's decision should be affirmed.

**IX.    The District Court Properly Denied Carter's and Hedgeman's *Batson* Challenges.**

Appellants next argue that the district court erred in finding that Austal did not violate *Batson v. Kentucky*, 476 U.S. 79 (1986) by striking certain African-American jurors.  (Appellants' Br., pp.112-115).  The district court denied Carter's and Hedgeman's *Batson* challenges for the reasons stated on the record during the August 30, 2011 jury selection proceeding.  Appellants, however, failed to timely request the transcript of that proceeding and have not provided or cited the transcript in their principal brief.[56]  "By failing to order the transcript, [Appellants]

---

[56]    Appellants request permission to supplement the record on appeal with the voir dire transcript, explaining that they "realized that jury selection was not included in the transcript," and outlining related communications between counsel and the court reporter.  (Appellants' Br., p.113 n.9).  Appellants, however, have failed to explain why such supplementation is warranted, especially considering they waited until September 25, 2012 (more than six months after filing their notices of appeal and just 15 days before their principal brief was originally due) to request the transcript.  (R797).  Each of Appellants' counsel was present during voir dire, and they offer no excuse why they neglected to designate the voir dire transcript as part of the record on appeal when they designated the remainder of the trial transcript.  Appellants' challenge to the district court's *Batson* rulings is a mere afterthought.  The Rules do not permit such whimsical noncompliance.  Fed. R. App. 10(b)(1); 11th Cir. R. 10-1.

As noted above, Appellants take great liberties with the facts.  The record will reflect that Austal articulated race-neutral reasons for each of its strikes and the district court's rulings were correct.  Therefore, should the Court grant Appellants' request and Appellants subsequently reference the jury selection proceedings in their reply brief, Austal respectfully requests that the Court grant it leave to file a supplemental brief to address Appellants' arguments.

86

waived the issue and [the Court] cannot review it." *Mosaic Fertilizer, LLC v. Van Fleet Int'l Airport Dev. Group, LLC*, No. 11-15591, 2012 WL 3490904, *4 (11th Cir. Aug. 15, 2012); *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1224 (11th Cir. 2012) ("Under the 'absence equals affirmance' rule, the burden is on the appellant to ensure the record on appeal is complete, and where a failure to discharge that burden prevents us from reviewing the district court's decision we ordinarily will affirm the judgment." (internal quotation marks omitted)). *See also* Fed. R. App. P. 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion.");

## X.    The District Court Properly Instructed The Jury.

Provided the district court does not misstate the law, it has "wide discretion as to the style and wording employed in its [jury] instruction." *McCormick*, 293 F.3d at 1260. Under this deferential standard, the Court "examine[s] 'whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled.' " *Id*. (quoting *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1295 (11th Cir. 1998)). The Court " 'will only reverse the lower court because of an erroneous instruction if ... left with a substantial and ineradicable doubt as to whether the jury was properly

87

guided in its deliberations.' " *Cold Stone Creamery*, 332 Fed. Appx. at 568 (quoting *McCormick*, 293 F.3d at 1260).

The district court not only accurately stated the law regarding hostile environment, *see Whitby,* 2012 WL 2504919, *4, but restated nearly verbatim the Eleventh Circuit's "Pattern Jury Instructions (Civil) 2005." (*Compare* Pattern Jury Instructions (Civil) 2005 at 84-93, *available at* http://www.ca11.uscourts.gov/documents/pdfs/civjury.pdf (last visited October 24, 2012) *with* Tr67-Tr71 (preliminary) *and* Tr1859-Tr1864 (final)).

Additionally, Appellants' argument that "the instruction that only acts which each Plaintiff was aware were to be considered as part of each Plaintiff's claim was also error" lacks merit. (Appellants' Br., p.116). The district court's instruction accurately states the law. *See Edwards,* 49 F.3d at 1522 (incidents not made known to plaintiff until after her termination could not have contributed to her hostile environment); *see also Brooks*, 229 F.3d at 924 ("Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive."). In fact, the jury instructions Appellants proposed to the district court actually included the requirement that the harassing conduct be known to the Plaintiff to support that Plaintiff's claim. (R463:10 ("Although in judging the hostility of the environment you may consider whether remarks were made in the presence of the plaintiffs or

directed at the plaintiffs, you must remember that racial harassment that is not directed at the plaintiff can contribute to a hostile environment *if the plaintiff was aware of it.*") (emphasis added)).  Moreover, Appellants have not demonstrated "a substantial and ineradicable doubt" that the jury was misguided.  *McCormick*, 293 F.3d at 1260.  Accordingly, the district court's jury instructions do not warrant reversal.

## XI.    The District Court Did Not Abuse Its Discretion In Allowing Austal's Rebuttal Witnesses To Testify At Trial.

Lastly, Appellants assert that the district court erred by permitting Austal's rebuttal witnesses Marcus Henson, Kevin Lewis, Erin Reagan, Wilbur Lee, and Doug Thorn to testify because the witnesses were not identified in Austal's initial or supplemental disclosures under Fed. R. Civ. P. 26(a)(1).  (Appellants' Br., p.117).  Appellants also argue that Lee and Thorn were improper because they were not included on Austal's pre-trial witness lists.  (*Id.*).  Appellants cite no supporting authority.

These witnesses were called to rebut certain testimony by the Trial Plaintiffs, and the district court did not abuse its discretion in allowing them to testify.  "The trial judge has broad discretion in determining whether to admit evidence and witnesses . . . ."  *Eades v. Ala. Dep't of Human Res.*, 298 Fed. Appx. 862, 864 (11th Cir. 2008) (quoting *Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th

Cir. 1980)). The Court reviews such rulings for a clear abuse of discretion, and absent such showing, the district court's decision will not be disturbed. *Calamia*, 632 F.2d at 1237; *see also Goldsmith*, 513 F.3d at 1276 (district's evidentiary rulings will not be overturned "unless moving party establishes a substantial prejudicial effect."). Here, Appellants do not even attempt to establish a "clear abuse of discretion" or "substantial prejudicial effect."

Furthermore, Appellants again misstate the facts. Austal did not present Appellants with proposed defense witnesses on the eve of trial. To the contrary, pursuant to the district court's pre-trial order (R399-1), Austal timely submitted its witness list on August 18, 2011, wherein Austal listed Henson, Lewis, and Reagan. (R399:1;R399-1:1,3-4;R409-10:2-4). Austal supplemented its witness list on September 8, 2011, pursuant to the district court's order following the final pretrial conference (R414:2), and again listed Henson, Lewis, and Reagan. (R453-3:2-4). Thus, Appellants had notice of witnesses Henson, Lewis, and Reagan prior to trial and consistent with the district court's pretrial orders.

Contrary to Appellants' argument, Lee and Thorn also were previously disclosed. In fact, both witnesses were identified by Appellants in their initial and supplemental disclosures.[57] Also, Appellants Sullivan and F. Thomas identified

---

[57] Austal's motion to supplement the record to include Appellants' initial and supplemental disclosures is pending before the Court. The disclosures establish that the witnesses were not previously undisclosed as Appellants' contend, and

Lee in their interrogatories responses.  (R214-3:9;R286-34:7).  Thus, none of the witnesses were "undisclosed" to Appellants, and their arguments to the contrary are disingenuous.

Appellants have not demonstrated that the district court abused its discretion in permitting Austal's rebuttal witnesses to testify or that its rulings warrant reversal.  Therefore, the district court's rulings should be affirmed.

## XII. Appellants Have Not Attempted to Establish The Jury's Verdict Was Clearly Erroneous Or That The District Court Erred In Denying Their Motion For Judgment As A Matter of Law And They Have Waived These Issues.

Carter and Hedgeman's notice of appeal purports to appeal the jury's verdict.  (R752).  Additionally, Appellants assert that the district court's ruling denying their motion for judgment as a matter of law was erroneous and identify the ruling as one of the issues to be decided by this Court.  (Appellants' Br. at p.31).   Appellants have made no attempt in their principal brief to establish or even argue (i) that Carter and Hedgeman were entitled to judgment as a matter of law, or (ii) that the jury's verdict was clearly erroneous.  Appellants, therefore, have waived these arguments and are precluded from addressing them in their reply brief.  *Mesa Air Group., Inc. v. Delta Air Lines, Inc.*, 573 F.3d 1124, 1130 n.7 (11th Cir. 2009) (holding that an argument not made in the initial brief is

---

with the Court's permission, Austal will submit the disclosures for the Court's review.

waived); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (11th Cir. 2006) ("[A]rguments not raised in the opening brief are waived."). Moreover, the evidence Austal presented at trial (discussed, *supra*, at pp.45-46) overwhelmingly supports the jury's verdict.

## CONCLUSION

Based on the foregoing, this Court should affirm (i) the district court's orders granting summary judgment in Austal's favor concerning the Non-Trial Plaintiffs' claims, and (ii) the jury's verdicts in Austal's favor concerning Carter's and Hedgeman's claims.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations provided by the Court's Order dated October 19, 2012 because it contains 20,970 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). It also complies with the typeface and style requirements of Rules 32(a)(5) and (6) because it was typed in proportionally spaced typeface using Microsoft Word, 14-point Times New Roman typeface.

*/s/ Anne Laurie McClurkin*
Thomas M. O'Hara (OHART4140)
tohara@mcdowellknoght.com
Brian P. McCarthy (MCCAB7434)
bmccarthy@mcdowellknight.com
Anne Laurie McClurkin (SMITA2262)
amcclurkin@mcdowellknight.com
*Attorneys for Defendant-Appellee,*
   *Austal USA, LLC*

**OF COUNSEL:**

**McDOWELL KNIGHT ROEDDER**
   **& SLEDGE, L.L.C.**
Post Office Box 350
Mobile, Alabama 36601
Telephone:  251-432-5300
Facsimile:  251-432-5303
www.mcdowellknight.com

## CERTIFICATE OF SERVICE

I certify that, on November 21, 2012, the original and six copies of this brief were delivered to the Court of Appeals and one copy to the attorneys listed below by U.S. First Class Mail, Postage Prepaid.  I also certify that, on November 21, 2012, I uploaded a copy of this brief to the Court's website.

Rocco Calamusa, Jr.
Kevin W. Jent
Jacob Andrew Kiser
Candis A. McGowan
Ann C. Robertson
WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
*Counsel for Plaintiffs-Appellants*

*/s/ Anne Laurie McClurkin*
Anne Laurie McClurkin

93